IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Daniel Gordon, et al.,

      Plaintiffs,

     v.

Amadeus IT Group, S.A., Amadeus North
America, Inc., Amadeus Americas, Inc., Sabre
Corporation f/k/a Holdings Corporation, Sabre
Holdings Corporation, Sabre GLBL Inc., Sabre
Travel International Limited, Travelport
Worldwide Limited, and Travelport LP d/b/a
Travelport,

      Defendants.

Civ. A. No. 1:15-cv-05457-KPF

ECF Case

## DEFENDANTS' JOINT MOTION TO DISMISS
## THE AMENDED COMPLAINT

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ............................................................................................................. 1

THE AMENDED COMPLAINT'S ALLEGATIONS .................................................................. 2

I.    GDSs AND THEIR ROLE IN DISSEMINATING AIRLINE FLIGHT AND FARE INFORMATION ........ 2

II.   THE ALLEGED CONSPIRACY AND CLAIMED HARM ................................................. 4

ARGUMENT ................................................................................................................... 6

I.    THE AIRLINE DEREGULATION ACT PREEMPTS ALL OF PLAINTIFFS' STATE LAW CLAIMS ...... 6

      A.    Plaintiffs' State Law Claims Relate to, Have a Connection with, or
            Reference Airline Prices, Routes, or Services ........................................................ 7

      B.    The ADA's Preemption Provision Is Not Limited to Claims Against
            Airlines, but Also Preempts Claims Against GDSs ................................................ 8

      C.    Applying ADA Preemption to Bar Plaintiffs' Claims Is Consistent with the
            Purpose of the ADA ............................................................................................ 12

            1.    Allowing Plaintiffs' Claims to Proceed Would Be Inconsistent with
                  the ADA's Mandate of a Single Federal Regulatory Scheme ................... 12

            2.    Applying ADA Preemption Would Not Allow the Alleged Conduct
                  to Escape Review ....................................................................................... 13

            3.    Preemption Applies to Claims Alleging Harm to Competition ................. 14

II.   PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS .................................................. 15

      A.    The Test for Antitrust Standing ........................................................................... 16

            1.    State and Federal Courts Impose Threshold Standing Requirements
                  Based on The *AGC* Factors and Related Concepts of Proximate
                  Cause ......................................................................................................... 16

            2.    Antitrust Standing Requirements Are Not Diminished by a State's
                  "Repeal" of the Federal *Illinois Brick* Doctrine ...................................... 18

      B.    Plaintiffs' Federal and State Antitrust Claims Are Too Remote and
            Speculative, and Are Better Prosecuted by Others ............................................. 20

            1.    Courts Consistently Dismiss Similar Claims for Lack of Standing ........... 20

|   |   | 2. | Plaintiffs' Injuries Are Too Remote to Give Rise to Antitrust Standing | 22 |
|---|---|----|------|----|
|   |   | 3. | Plaintiffs' Injuries Are Too Speculative to Give Rise to Antitrust Standing | 25 |
|   |   | 4. | There Are "Better Plaintiffs" | 28 |
|   | C. |  | Plaintiffs' Consumer Protection Claims, to the Extent Not Otherwise Defective, Are Also Foreclosed Because They Are Remote and Speculative | 28 |
| III. |   |   | PLAINTIFFS' CLAIMS ARE TIME-BARRED | 30 |
|   | A. |   | Each of Plaintiffs' State Law Damages Claims Is Time Barred in Its Entirety by the Applicable Statute of Limitations | 31 |
|   |   | 1. | Plaintiffs Fail to Establish the Elements of Fraudulent Concealment Necessary to Toll the Applicable Statutes of Limitations | 32 |
|   |   | 2. | Plaintiffs' Conclusory Allegations of a "Continuing Conspiracy" Do Not Preserve Their Damages Claims Based on Recent Purchases | 36 |
|   | B. |   | Plaintiffs Cannot Recover for Damages Suffered Outside the Limitations Period Even if That Period is Tolled | 39 |
|   | C. |   | The Doctrine of Laches Bars Plaintiffs' Federal Antitrust Claim | 39 |
| CONCLUSION | | | | 40 |

## TABLE OF AUTHORITIES

### Federal Cases

*A.I.B. Express, Inc. v. FedEx Corp.,*
   358 F. Supp. 2d 239 (S.D.N.Y. 2004) ........................................................................................ 15

*Abdu-Brisson v. Delta Airlines, Inc.,*
   128 F.3d 77 (2d Cir. 1997) .................................................................................................. 26-27

*Allen v. Dairy Farmers of America, Inc.,*
   748 F. Supp. 2d 232 (D. Vt. 2010) ..................................................................................... 33, 38

*Allen v. Dairy Farmers of America, Inc.,*
   No. 5:09-cv-230, 2014 WL 2610613 (D. Vt. June 11, 2014) .................................................. 37

*American Airlines, Inc. v. Travelport Ltd.,*
   No. 04:11-CV-244-Y, 2011 WL 13047291 (N.D. Tex. Nov. 21, 2011) ............................... 10, 14

*American Airlines, Inc. v. Travelport Ltd.,*
   No. 04:11-CV-244-Y, 2012 WL 12507645 (N.D. Tex. Feb. 28, 2012) ..................................... 10

*Associated General Contractors, Inc. v. California State Council of Carpenters,*
   459 U.S. 519 (1983) .......................................................................................................15-17, 28

*Atlantic Richfield Co. v. USA Petroleum Co.,*
   495 U.S. 328 (1990) ................................................................................................................. 17

*Automated Salvage Transport, Inc. v. Wheelabrator Environmental Systems, Inc.,*
   155 F.3d 59 (2d Cir. 1998) ...................................................................................................... 25

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................................................... 16, 31

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
   603 F. 2d 263 (2d Cir. 1979) ................................................................................................... 38

*Cargill, Inc. v. Monfort of Colorado, Inc.,*
   479 U.S. 104 (1986) ................................................................................................................. 17

*City of Omaha, Nebraska Civilian Employees' Retirement System v. CBS Corp.,*
   679 F.3d 64 (2d Cir. 2012) ...................................................................................................... 35

*Conopco, Inc. v. Campbell Soup Co.*,
    95 F.3d 187 (2d Cir. 1996) ............................................................................. 39

*Daniel v. American Board of Emergency Medicine*,
    428 F.3d 408 (2d Cir. 2005) ....................................................................... 16-17

*Frontier Airlines, Inc. v. United Airlines, Inc.*,
    758 F. Supp. 1399 (D. Colo. 1989) ............................................................. 9-12

*Galileo International, L.L.C. v. Ryanair Ltd.*,
    No. 01 C 2210, 2002 WL 314500 (N. D. Ill. Feb. 27, 2002) ........................ 11

*Gatt Communications, Inc. v. PMC Associates, L.L.C.*,
    711 F.3d 68 (2d Cir. 2013) ................................................................... 16-17, 20

*Gorbey ex. rel. Maddox v. American Journal of Obstetrics & Gynecology*,
    849 F. Supp. 2d 162 (D. Mass. 2012) ........................................................ 30-31

*Hinds County, Mississippi v. Wachovia Bank, N.A.*,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009) ............................................................ 31

*Huntleigh Corp. v. Louisiana State Board of Private Security Examiners*,
    906 F. Supp. 357 (M.D. La. 1995) ................................................................. 11

*Illinois Brick v. Illinois*,
    431 U.S. 720 (1977) ................................................................................... 18-19

*In re Air Cargo Shipping Services Antitrust Litigation*,
    697 F.3d 154 (2d Cir. 2012) .................................................................... 12, 14

*In re Air Cargo Shipping Services Antitrust Litigation*,
    Nos. 06-MDL-1775 (JG), 10-CV-639 (JG), 2010 WL 10947344 (E.D.N.Y. Sept. 22,
    2010) ................................................................................................................ 31

*In re Cathode Ray Tube (CRT) Antitrust Litigation*,
    No. C 07-5944 SC, 2014 WL 1088256 (N.D. Cal. Mar. 13, 2014) ............... 29

*In re Ciprofloxacin Hydrochloride Antitrust Litigation*,
    261 F. Supp. 2d 188 (E.D.N.Y. 2003) ............................................... 33, 36, 38

*In re Dairy Farmers Antitrust Litigation*,
    No. 9-CV-3690, 2015 WL 3988488 (N.D. Ill. June 29, 2015) ..................... 30

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation,*
    516 F. Supp. 2d 1072 (N.D. Cal. 2007) ................................................................. 18

*In re Elevator Antitrust Litigation,*
    502 F.3d 47 (2d Cir. 2007) ..................................................................................... 31

*In re EVIC Class Action Litigation,*
    Nos. M-21-84, MDL-1339, 00-CIV-3811 (RMB), 02-CIV-2703 (RMB), 2002 WL
    1766554 (S.D.N.Y. Jul. 31, 2002) .......................................................................... 14

*In re Korean Airlines Co., Ltd. Antitrust Litigation,*
    642 F.3d 685 (9th Cir. 2011) ............................................................................13-14

*In re Merrill Lynch Ltd. Partnership Litigation,*
    154 F.3d 56 (2d Cir. 1998) ............................................................................. 32, 35

*In re Wellbutrin Antitrust Litigation,*
    756 F. Supp. 2d 670 (E.D. Pa. 2010) .................................................................... 19

*Kabealo v. Huntington National Bank,*
    17 F.3d 822 (6th Cir. 1994) ................................................................................... 38

*Karl Storz Endoscopy-America, Inc. v. Surgical Technologies, Inc.,*
    285 F.3d 848 (9th Cir. 2002) ................................................................................. 32

*Klein v. Goetzmann,*
    770 F. Supp. 78 (N.D.N.Y. 1991) .......................................................................... 30

*Kloth v. Microsoft Corp.,*
    444 F.3d 312 (4th Cir. 2006) ................................................................................. 40

*Kramer v. Time Warner, Inc.,*
    937 F.2d 767 (2d Cir. 1991) .................................................................................. 34

*Laumann v. National Hockey League,*
    907 F. Supp. 2d 465 (S.D.N.Y. 2012) .................................................................... 17

*Laydon v. Mizuho Bank, Ltd.,*
    No. 12-cv-3419 (GBD), 2014 U.S. Dist. LEXIS 46368 (S.D.N.Y. Mar. 28, 2014) ................. 25

*Little Rock Cardiology Clinic, P.A. v. Baptist Health,*
    573 F. Supp. 2d 1125 (E.D. Ark. 2008) ................................................................. 37

*Loeb Industries, Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) ................................................................................................. 19

*Lombardo v. Johnson & Johnson Consumer Co.*,
    Civ. No. 13-06536-Civ-Scola, 2015 WL 5025466 (S.D. Fla. Aug. 12, 2015) ........................... 30

*Lyn-Lea Travel Corp. v. American Airlines, Inc.*,
    283 F.3d 282 (5th Cir. 2002) ........................................................................................... 9-10, 13

*Madison Square Garden, L.P. v. National Hockey League*,
    No. 07 CV 8455(LAP), 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ...................................... 39

*Manassas Travel, Inc. v. Worldspan, L.P.*,
    No. 2:07-CV-701-TC, 2008 WL 1925135 (D. Utah Apr. 30, 2008) .......................................... 11

*Marlow v. AMR Services Corp.*,
    870 F. Supp. 295 (D. Haw. 1994) .............................................................................................. 11

*Masters v. Wilhelmina Model Agency*,
    No. 02 Civ. 4911(HB), 2003 WL 145556 (S.D.N.Y. Jan. 16, 2003) ......................................... 39

*McKenna v. Wright*,
    386 F.3d 432 (2d Cir. 2004) ...................................................................................................... 30

*McKissack v. Swire Pacific Holdings, Inc.*,
    No. 09-22086-Civ., 2010 WL 3701577 (S.D. Fla. Sept. 15, 2010) ........................................... 32

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ........................................................................................................... 6, 9, 12

*National Group for Communications & Computers, Ltd. v. Lucent Technologies Inc.*,
    420 F. Supp. 2d 253 (S.D.N.Y. 2006) ....................................................................................... 32

*Northwest, Inc. v. Ginsberg*,
    134 S. Ct. 1422 (2014) ................................................................................................................. 6

*Paycom Billing Services, Inc. v. MasterCard International, Inc.*,
    467 F.3d 283 (2d Cir. 2006) ............................................................................................... passim

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    134 S. Ct. 1962 (2014) ............................................................................................................... 40

*Poster Exchange Inc. v. National Screen Services Corp.*,
    517 F.2d 117 (5th Cir. 1975) ..................................................................................................... 37

*Reading Industries, Inc. v. Kennecott Copper Corp.,*
    631 F.2d 10 (2d Cir. 1980) ................................................................................20, 25

*Ryan v. Microsoft Corp.,*
    No. 14-CV-04634-LHK, 2015 WL 1738352 (N.D. Cal. 2015) .................................37

*Southeast Missouri Hospital v. C.R. Bard, Inc.,*
    No. 1:07CV0031 TCM, 2008 WL 4104534 (E.D. Mo. Aug. 27, 2008) .....................38

*U.S. Philips Corp. v. Princo Corp.,*
    No. 02 Civ. 246(CLB), 2005 U.S. Dist. LEXIS 6820 (S.D.N.Y. Jan. 24, 2005) .......37

*United States v. Island Park,*
    791 F. Supp. 354 (E.D.N.Y. 1992) .........................................................................34

*Virgin Atlantic Airways Ltd. v. British Airways PLC,*
    872 F. Supp. 52 (S.D.N.Y. 1994) ...........................................................................14

*Vitale v. Marlborough Gallery,*
    No. 93-Civ-6276 (PKL), 1994 WL 654494 (S.D.N.Y. July 5, 1994) .............................32, 36-37

*Wolf v. Wagner Spray Tech Corp.,*
    715 F. Supp. 504 (S.D.N.Y. 1989) .......................................................................34-35

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
    401 U.S. 321 (1971).................................................................................................31

**State Cases**

*Beckler v. Visa U.S.A., Inc.,*
    No. 09-04-C-00030, 2004 WL 2115144 (N.D. Dist. Ct. Aug. 23, 2004)...................21

*Beckler v. Visa U.S.A., Inc.,*
    CIV. 09-04-C-00030, 2004 WL 2475100 (N.D. Dist. Ct. Sept. 21, 2004) .................21

*Bennett v. Visa U.S.A. Inc.,*
    198 S.W. 3d 747 (Tenn. Ct. App. 2006) .................................................................19

*Consiglio-Tseffos v. Visa U.S.A., Inc.,*
    No. CV 2003-020170, 2004 WL 3030043 (Ariz. Super. Ct. Dec. 8, 2004)...............23

*Crouch v. Crompton Corp.,*
    No. 02 CVS 4375, 2004 WL 2414027 (N.C. Super. Ct. Oct. 28, 2004)...............20-21

*Fucile v. Visa U.S.A., Inc.,*
 No. S1560-03 CNC, 2004 WL 3030037 (Vt. Super. Ct. Dec. 27, 2004) ............................ 23, 27

*Gaebler v. New Mexico Potash Corp.,*
 676 N.E. 2d 228 (Ill. App. 3d Dist. 1996) ................................................................................. 29

*Goldberg v. Visa U.S.A., Inc.,*
 No. 04 CA 0005158, 2007 WL 2011732 (D.C. Super. Ct. Mar. 2, 2007) ................................... 21

*Gutzwiller v. Visa U.S.A., Inc.,*
 C4-04-58, 2004 WL 2114991 (Minn. Dist. Ct. Sept. 15, 2004) ................................................ 27

*Hallam v. Alaska Airlines, Inc.,*
 91 P.3d 279 (Alaska 2004) ......................................................................................................... 15

*Ho v. Visa U.S.A., Inc.,*
 No. 112316/00, 787 N.Y.S.2d 677, 2004 N.Y. Misc. LEXIS 577 (N.Y. Cty. Super. Ct.,
 N.Y. Apr. 21, 2004) ................................................................................................................... 21

*Ireland v. Microsoft Corp.,*
 No. 00CV-201515, 2001 WL 1868946 (Mo. Cir. Ct. Jan. 24, 2001) ......................................... 29

*Kanne v. Visa U.S.A. Inc.,*
 723 N.W.2d 293, 297-99 (Neb. Sup. Ct. 2006) ......................................................................... 28

*Knowles v. Visa U.S.A., Inc.,*
 No. Civ.A. CV-03-707, 2004 WL 2475284 (Me. Super. Ct. Oct. 20, 2004) ............................. 26

*Laughlin v. Evanston Hospital,*
 550 N.E.2d 986 (Ill. 1990) ......................................................................................................... 29

*Lorix v. Crompton Corp.,*
 736 N.W.2d 619 (Minn. 2007) ............................................................................................ 18, 27

*Nass-Romero v. Visa U.S.A. Inc.,*
 279 P.3d 772 (N.M. Ct. App. 2012) .................................................................................. 22, 26, 28

*Peterson v. Visa U.S.A., Inc.,*
 No. Civ.A. 03-8080, 2005 WL 1403761 (D.C. Super. Ct. Apr. 22, 2005) ........................... 21, 23

*Southard v. Visa U.S.A., Inc.,*
 734 N.W.2d 192 (Iowa 2007) .............................................................................................. 18, 22

*Stark v. Visa,*
   No. 03-055030-CZ, 2004 WL 1879003 (Mich. Cir. Ct. July 23, 2004) ....................................22

*Strang v. Visa U.S.A., Inc.,*
   No. 03 CV 011323, 2005 WL 1403769 (Wis. Cir. Ct. Feb. 8, 2005)..........................................27

**Federal Statutes**

49 U.S.C. § 41712(a) ..............................................................................................................13

49 U.S.C. § 41713(b) ..............................................................................................................13

49 U.S.C. § 41713(b)(1) ........................................................................................................1, 6

**State Statutes**

740 Ill. Comp. Stat. Ann. 10/7(2)..........................................................................................19

S.C. Code Ann. § 39-5-140.....................................................................................................29

Tennessee Trade Practices Act, T.C.A. § 47-25-101 *et seq.*.................................................19

**Other Authorities**

69 Fed. Reg. 976, 996 (Jan. 7, 2004) .....................................................................................13

2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 320a (4th ed. 2014) ..........................40

2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 320c1 (4th ed. 2014) ........................38

## INTRODUCTION

Plaintiffs filed this putative class action on behalf of all United States residents who, at any time since June 1, 2006, bought an airline ticket on any of nine major U.S. airlines. (Am. Compl. ¶ 348, Oct. 2, 2015, ECF No. 106 ("AC").) Plaintiffs allege that Defendants—three Global Distribution Systems ("GDSs")—conspired to "deman[d] full-content agreements" from the airlines, which "requir[e] the Airlines to make all of their content [*i.e.* 'flight, fare, and related information'] available on the Defendants' GDSs . . . ." (*Id.* ¶¶ 3, 6, 18.) According to Plaintiffs, these "full content" agreements enabled Defendants to charge certain airlines higher fees for their GDS services, which in turn led the airlines to charge "inflated ticket prices for airline passengers." (*Id.* ¶¶ 2, 25.) Plaintiffs seek injunctive relief under federal antitrust law (Count I), plus damages for amounts they allegedly overpaid for airline tickets pursuant to various states' antitrust and consumer protection laws (Counts II and III). (*Id.* ¶¶ 395-456.)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Plaintiffs' claims should be dismissed with prejudice for at least three independent reasons. *First*, the Airline Deregulation Act ("ADA") preempts Plaintiffs' state law claims. The ADA expressly preempts any action to enforce state law "related to a price, route, or service of an air carrier." *See* 49 U.S.C. § 41713(b)(1). Courts have repeatedly applied the ADA to bar such state law claims against a GDS in light of the GDS's central role as an intermediary in the distribution of air fares and the booking of air travel. Plaintiffs' claims here—for which the sole alleged injury is in the form of "inflated ticket prices"—plainly "relat[e] to [the] price[s], route[s], or service[s] of an air carrier," and thus are preempted. (*See, e.g.*, AC ¶¶ 2, 36, 363, 400.)

*Second*, Plaintiffs lack antitrust standing to bring their claims under federal and state law. Plaintiffs' allegations establish that they never purchased Defendants' GDS services. And Plaintiffs do not allege they were ever directly harmed by the alleged conspiracy. Instead, they

1

allege derivative harm from purportedly paying more for airline tickets, which they bought from non-party airlines. Plaintiffs claim they paid "inflated" air fares as a result of the airlines' increased costs from paying allegedly "inflated" GDS fees. Such derivative harm resulting from an alleged increase in the airlines' operating costs, however, is simply too far removed from the alleged antitrust violation to give these Plaintiffs standing.

*Third*, Plaintiffs' state law claims are barred by applicable statutes of limitations, and their Sherman Act claim for equitable relief is barred by the doctrine of laches. Plaintiffs expressly allege that the "implementation" of the alleged conspiracy was "complete" in 2007, more than eight years before they filed this case and well outside the statutes of limitations applicable to their claims. (AC ¶¶ 237-39.) Plaintiffs cannot avoid dismissal with conclusory allegations of "fraudulent concealment" or a "continuing violation." (*See* AC ¶¶ 374-94.) Fraudulent concealment requires, at a minimum, concealment of the alleged conduct, and none occurred here. Plaintiffs' conclusory allegations of a "continuing violation" similarly cannot shield Plaintiffs' claims from dismissal because Plaintiffs' alleged injuries flow from contractual terms of, and GDS fees charged under, pre-limitations period contracts or renewals of those contracts.

For these reasons, and as demonstrated below, all three Counts in the Amended Complaint should be dismissed with prejudice.

THE AMENDED COMPLAINT'S ALLEGATIONS

**I.   GDSS AND THEIR ROLE IN DISSEMINATING AIRLINE FLIGHT AND FARE INFORMATION**

A GDS is a computerized system that stores schedule and fare information for travel suppliers (such as hotels, car rental companies, and airlines), and provides "a technological link" between such suppliers and both online and traditional "brick and mortar" travel agencies. (AC ¶ 1.) According to the Complaint, GDSs "function as electronic networks for the centralized

2

distribution of flight, fare, and related information ('content') for the vast majority of airlines."

(AC ¶ 3.) This role is summarized in the graphic below:



Travel agents subscribe to one or more GDSs to search for, book, and manage travel itineraries, such as airline tickets and hotel rooms. (*See id.*) GDSs, as alleged by Plaintiffs, are thus "critical for the Airlines to reach many of their customers." (*Id.* ¶ 4.)

In its role as an intermediary, "each GDS must have access to every Airline's content to service their travel agency customers." (*Id.*) Indeed, as Plaintiffs allege, "a GDS that did not have access" to the content (*i.e.*, flight and fare information) of one of the large airlines, for instance, would "quickly lose bookings to a GDS that did." (*Id.*) The "amount of content" that each "Airline offers to a GDS is therefore a critical concern" to each GDS. (*Id.*) Each GDS thus negotiates for as much airline content as possible (*i.e.*, "full content") to enable it to compete with the other GDSs. "For each flight segment booked by a travel agent that uses a GDS, the Airline is charged a fee ('GDS fee')." (*Id.* ¶ 3.) Because GDSs depend on access to airline content, "an airline c[an] agree to provide more content in return for lower GDS fees." (*Id.* ¶ 8.)

Although GDSs provide valuable services to airlines and travel agents, *travelers* (including Plaintiffs) do not actually purchase airline tickets or any other services from GDSs. And, while a travel agent may use a GDS to book an airline ticket for its client, travelers can and frequently do buy tickets through other channels. In fact, most of the named Plaintiffs bought their tickets directly from an airline; not through a travel agent using a GDS.[1] For these bookings, because the airlines do not use the services of a GDS, the airline does not pay any GDS fee. (*Id.* ¶ 3 (airlines are charged a fee for segments "booked by a travel agent that uses a GDS").)

## II.   THE ALLEGED CONSPIRACY AND CLAIMED HARM

Plaintiffs allege that Defendants conspired to "impose" a set of "contractual provisions on the Airlines." (AC ¶ 5.) Plaintiffs assert that such "full-content agreements" "require the Airlines to make all of their content available on the Defendants' GDSs" and prohibit the airlines "from surcharging travel agents for using a GDS . . . ." (*Id.* ¶ 6, 18.) In other words, Defendants' alleged conspiracy was to negotiate for contractual provisions that Plaintiffs acknowledge are required "to service their travel agency customers." (*Id.* ¶ 4; *see also id.* ¶ 212.)

Plaintiffs further allege that the full content agreements made it more difficult for the GDSs' competitors to compete, and thus indirectly "enabl[ed] [Defendants] to charge supracompetitive GDS fees." (*Id.* ¶ 2; *see also id.* ¶ 25.) Plaintiffs assert that these "inflated" fees then led the airlines to charge Plaintiffs "supracompetitive prices . . . for Airline tickets." (*Id.* ¶ 363; *see also* ¶¶ 2, 363, 400, 421.)[2] Plaintiffs seek damages for alleged overcharges they incurred

---

[1] The Amended Complaint lists 76 named Plaintiffs, although two of those plaintiffs have since voluntarily dismissed their claims. (ECF Nos. 145, 146.) Of the remaining 74 Plaintiffs, 53 purchased tickets directly from the airline, which does not involve a GDS in any way. (*Id.* ¶¶ 43-117 (detailing how each Plaintiff booked airline tickets, in some cases using more than one method).)

[2] Plaintiffs do not allege Defendants conspired to fix prices (*i.e.*, GDS booking fees). Rather, they allege only a conspiracy to negotiate with airlines for full content. (*Id.* ¶¶ 4-6.) Nor do Plaintiffs

when purchasing airline tickets, including tickets purchased directly from an airline (where no GDS was involved).

Plaintiffs' claims arise from conduct that allegedly began in 2005. (*See id.* ¶¶ 194, 205, 216, 218.) The alleged "direct evidence" and "crucial element" of Defendants' "scheme" was a temporary "Backstop Agreement," signed and publicly announced in 2006, under which Sabre and Amadeus committed to supply each other "with any content that any airline provided to only one of them." (*Id.* ¶¶ 19, 218, 220, 225, 236.) According to Plaintiffs, by 2007, Defendants had entered into separate full content agreements with various airlines, and the "implementation of Defendants' conspiracy was now complete." (*Id.* ¶¶ 237-39.) The most recent act allegedly undertaken by Defendants after the alleged conspiracy was completed took place when Defendants renewed their contracts with certain airlines in February 2011. (*Id.* ¶ 280.) Soon after, in April 2011, US Airways filed a federal court complaint alleging the same conspiracy alleged here, based on "precisely the same alleged conduct." (Eisler Letter to Court at 1, Nov. 3, 2015, ECF No. 131 ("ECF No. 131")); *see also US Airways, Inc. v. Sabre Holdings Corp.*, No. 11-cv-02725 (S.D.N.Y filed Apr. 21, 2011) (*US Airways v. Sabre*). Plaintiffs did not file this action until July 14, 2015.

Plaintiffs assert claims for damages under the antitrust and consumer protection laws of numerous states, and a claim for injunctive relief under Section 1 of the Sherman Act, on behalf of a class consisting of "all residents of the United States who purchased an airline passenger ticket for travel on any of [American, Continental, Delta, Northwest, United, US Airways, AirTran, Alaska, and JetBlue] between June 1, 2006 and the present." (AC ¶¶ 348, 403-56.)

---

allege that each of the GDSs' negotiations for full content was any secret to the airlines—the alleged victims—as each airline specifically negotiated its contract terms with each GDS.

**ARGUMENT**

**I.  THE AIRLINE DEREGULATION ACT PREEMPTS ALL OF PLAINTIFFS' STATE LAW CLAIMS**

The ADA expressly preempts any state "law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). In adopting the ADA, Congress included a sweeping preemption provision "to ensure that the States would not undo federal deregulation with regulations of their own" by proscribing all state regulations relating to "rates, routes or services." *Northwest, Inc. v. Ginsberg,* 134 S. Ct. 1422, 1428 (2014) (citation and internal quotation marks omitted). Federal law, therefore, is the exclusive means by which a party may pursue claims like the ones here "related to a price, route, or service of an air carrier." *Id.*

The Supreme Court has interpreted the ADA's preemption provision broadly. *See Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383-84 (1992). In *Morales,* the Court confirmed that the "expansive sweep" of the ADA preemption provision "express[es] a broad pre-emptive purpose" that is "conspicuous for its breadth." *Id.* The Court expressly held that the "deliberately expansive" phrase "relating to rates, routes, or services" preempts any "[s]tate enforcement action *having a connection with* or *reference to* airline 'rates, routes, or services.'" *Id.* (emphasis added); *see also Northwest,* 134 S. Ct. at 1430. The ADA, therefore, precludes any action that (1) seeks to enforce state law, and (2) directly or indirectly relates to, has a connection with, or references airline prices, routes, or services. *Id.*; 49 U.S.C. § 41713(b)(1).

Plaintiffs clearly seek to enforce state law. The Complaint on its face (Counts II and III) alleges that Defendants violated the laws of 30 separate states. (AC ¶¶ 403-56.) Specifically, Plaintiffs allege a "violation of . . . state law antitrust and consumer protection statutes." (*Id.* Prayer for Relief; *see also id.* ¶¶ 403-56.) Moreover, as demonstrated below, Plaintiffs' state law claims are "related to a price, route, or service of an air carrier," and are therefore preempted.

6

A.     **Plaintiffs' State Law Claims Relate to, Have a Connection with, or Reference Airline Prices, Routes, or Services**

Plaintiffs' claims plainly relate to, have a connection with, and/or reference the "price, route, or service" of an air carrier. The gravamen of Plaintiffs' claims is that Defendants conspired to impose on airlines certain contract terms relating to the way in which airline tickets are distributed, with the alleged effect of raising ticket prices. According to Plaintiffs, Defendants' alleged conspiracy "enabl[ed] them to charge supracompetitive GDS fees that have *inflated ticket prices for airline passengers*." (AC ¶ 2 (emphasis added).) Plaintiffs allege they "have suffered, and continue to suffer, injury to their business or property of the type that the antitrust laws were designed to prevent by paying *supracompetitive prices for airline tickets*." (*Id.* ¶ 400 (emphasis added); *see also id.* ¶ 363 (alleging "[t]he *supracompetitive prices* paid by Plaintiffs and Class members *for Airline tickets* are traceable to, and the direct, proximate and foreseeable result of, Defendants' supracompetitive prices for GDS fees") (emphasis added); *id.* ¶ 36 (alleging Defendants' conduct "resulted in *higher fares to all passengers*"); *id.* ¶ 421 (alleging Plaintiffs' "injury consists of paying *higher prices for air travel*") (emphasis added).) Indeed, according to the Amended Complaint, Plaintiffs' state law claims are not only "related to" airfares, but they have a "singular" connection with airline ticket prices. (*Id.* ¶ 34 (alleging Defendants' agreements with the airlines "cause a singular antitrust injury: supracompetitive GDS charges paid by all ticket purchasers, [including] by paying a bloated GDS fee *embedded in ticket prices*....") (emphasis added).)

Plaintiffs' Complaint also highlights the "critical" role GDSs play in the airline industry by marketing and distributing airline flights, fares, and services to passengers. (AC ¶ 4.) Plaintiffs allege that Defendants conspired to negotiate for the ability to distribute all of the airlines' flights and fares (*i.e.*, each airline's "full content") through their respective GDS. (*E.g.*, *id.* ¶¶ 5, 6.)

7

Plaintiffs also specifically allege that GDS contract provisions requiring airlines to distribute all of their content and services through the GDS interfered with the airlines' ability to distribute certain content and services exclusively through non-GDS channels. (*E.g.*, *id.* ¶¶ 6, 178, 240.) For instance, Plaintiffs assert that Defendants' alleged conspiracy directly affected the airlines' provision of "*services* like baggage check, Wi-Fi and premium seats," as well as their "ability to determine when, to whom, and under what circumstances this discrete content would be distributed." (*Id.* ¶ 26 (emphasis added); *see also id.* ¶ 207 (alleging Defendants' conduct affected the airlines' "freedom to market their *services* more efficiently") (emphasis added); *id.* ¶ 323 ("Had Defendants not unlawfully stifled actual and potential competition, the Airlines would have been free to market their *services* through a variety of channels as they saw fit ....") (emphasis added); *id.* ¶ 240 (alleging anticompetitive conduct of requiring that airlines "provide GDS subscribers access to the same types, amounts and levels of products, *services*, functionality ... that are available on other distribution channels") (emphasis added).) Plaintiffs' claims thus target not only the price of airline tickets, but how and where the airlines' tickets and services should be marketed and distributed.

In sum, by targeting the alleged impact of Defendants' conduct on airline pricing and on airlines' distribution of tickets and services, Plaintiffs' state law claims fall squarely within the scope of the ADA preemption provision.

## B.   The ADA's Preemption Provision Is Not Limited to Claims Against Airlines, but Also Preempts Claims Against GDSs

Plaintiffs have suggested that their state law claims are not preempted because the ADA preempts only claims *against an airline*. (ECF No. 131, at 2.) Similarly, they have asserted that the ADA does not preempt claims where airlines are the alleged "victims" of the defendant's conduct. (*Id.*) The courts have repeatedly rejected these arguments. Indeed, the Supreme Court

8

has expressly declined to hold that "only state laws specifically addressed to the airline industry

are pre-empted." *Morales*, 504 U.S. at 386.

Applying the Supreme Court's holding in *Morales* to claims against a GDS, the Fifth

Circuit expressly held that ADA preemption is not limited to claims brought against airlines. *Lyn-*

*Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 287 n.8 (5th Cir. 2002). The court affirmed

the district court's holding that a travel agency's state-law claims against Sabre were preempted by

the ADA. *Id.* at 288. The court rejected the exact argument Plaintiffs make here:

> Lyn-Lea also argues, without citing supporting authority, that its claims against Sabre
> cannot be preempted because Sabre is not an air carrier. ***ADA preemption is not***
> ***limited to claims brought directly against air carriers***. . . . Rather, claims are
> preempted if they "relate to" the prices, routes, or services of an air carrier.

*Id.* at 287 n.8 (emphasis added).

The *Lyn-Lea* court concluded that claims relating to the GDS services Sabre provides to

airlines and travel agencies "plainly fall within the ADA's deregulatory concerns" due to the

important role GDSs and their travel agency customers play as "intermediaries between carriers

and passengers," as well as their "significant relationship to the economic aspects of the airline

industry." 283 F.3d at 287-88. In affirming dismissal of the plaintiff's claims, the court

emphasized that "[t]he ADA's legislative history . . . provides 'clear and convincing evidence that

Congress intended to preempt state law in the regulation of [GDS[3]] services . . . .'" *Id.* at 288-89

(citing to H.R. Rep. No. 98-793, at 4 (1984), reprinted in 1984 U.S.C.C.A.N. 2857).[4]

---

[3]  In *Lyn-Lea* and *Frontier Airlines, Inc. v. United Airlines, Inc.*, 758 F. Supp. 1399 (D. Colo. 1989), the courts refer to GDSs as "CRSs" (computer reservation systems), the name given to such systems at their inception. *See Lyn-Lea*, 283 F.3d at 284; *Frontier*, 758 F. Supp. at 1043. The terms are used synonymously.

[4]  Plaintiffs argue that *Lyn-Lea* does not apply here because "Sabre was a part of American Airlines when the *Lyn-Lea* dispute was litigated." (ECF No. 131, at 2.) The Fifth Circuit specifically rejected that argument, noting that its holding did not turn on whether Sabre was owned by American Airlines (as it was when the case was filed), or a separate, independently-owned entity (as it was when the case was decided, after Sabre was spun off from the airline and

Similarly, in a case that Plaintiffs acknowledge involved "precisely the same alleged misconduct" as alleged here, (ECF No. 131, at 1), the court granted Sabre and Travelport's motion to dismiss American Airlines' state law claims as preempted under the ADA. *Am. Airlines, Inc. v. Travelport Ltd.*, No. 04:11-CV-244-Y, 2011 WL 13047291, at *14 (N.D. Tex. Nov. 21, 2011) ("*American Airlines*"). American's claims against the GDSs, like Plaintiffs' claims here, sought "the application of Texas common law in a way that would regulate [Sabre's and Travelport's] pricing policies," "commission structure," and "reservation practices." *Id.* (quotations and citation omitted). The court concluded that its application of ADA preemption to bar claims against GDSs was consistent with the purpose of the ADA because—as Plaintiffs allege here—claims against GDSs have a "significant relationship to the economic aspects of the airline industry," and thus fall within the scope of ADA preemption. *Id.* The court expressly rejected the argument "that the ADA's preemptive umbrella only covers claims against airlines—not global distribution systems ('GDSes') like Sabre and Travelport," and applied preemption to dismiss American's claims despite the fact that the airline was the alleged "victim." *American Airlines v. Travelport Ltd.*, No. 04:11-CV-244-Y, 2012 WL 12507645, at *3 (N.D. Tex. Feb. 28, 2012).

In *Frontier Airlines*, the court likewise dismissed state antitrust claims brought by an airline (again, the alleged victim) against a GDS. The court held that under the ADA, "[f]ederal law preempts state laws regulating the provision of [GDS] services." *Id.* at 1408. Emphasizing the GDSs' "essential" role in the airlines' "competition for passengers," the court concluded that the ADA "preempt[s] a state['s] attempt to enforce its law to determine whether conduct related to

___

replaced American as the defendant). 283 F.3d at 285 n.2; *see also American Airlines, Inc. v. Travelport Ltd.*, No. 4:11-CV-244-Y, 2012 WL 12507645, at *3 (N.D. Tex. Feb. 28, 2012) ("American makes a distinction between GDSes owned by airlines, such as Sabre at the time of *Lyn-Lea*, and independent GDSes, such as Sabre today. The Court does not find this distinction meaningful."). Similarly, as discussed below, other courts consistently have applied ADA preemption to bar claims against non-airline-owned GDSs.

the provision of [GDS] services was improper." *Id.* at 1408, 1410. As in *Lyn-Lea*, the court based

its holding, in part, on the ADA's legislative history, which provides "clear and convincing

evidence that Congress intended to preempt state law in the regulation of [GDS] services and to

provide federal antitrust remedies as the exclusive means for private enforcement of those

regulations." *Id.* at 1408.

Indeed, every federal court that has considered this issue has held the ADA preempts state-

law claims against a GDS like the ones here. *See Manassas Travel, Inc. v. Worldspan, L.P.*, No.

2:07-CV-701-TC, 2008 WL 1925135, at *2 (D. Utah Apr. 30, 2008) (granting GDS defendant's

motion to dismiss because the ADA preempted plaintiff's non-contract state law claims); *Galileo

Int'l, L.L.C. v. Ryanair Ltd.*, No. 01 C 2210, 2002 WL 314500, at *4-5 (N.D. Ill. Feb. 27, 2002)

(applying ADA preemption to dismiss state consumer protection claims brought against a GDS

because they "relat[e] to airline 'services' within the scope of the ADA's preemption clause").[5]

Each of these cases illustrates that the GDSs' integral—in Plaintiffs' words, "critical" (AC

¶ 4)—role as intermediaries between the airlines and travel agents provides the requisite

connection with airline prices, routes, or services to bar Plaintiffs' state law claims under the ADA.

The GDSs' central role in the airline industry, coupled with the Plaintiffs' repeated assertion that

Defendants' conduct directly affected the distribution and pricing of airline tickets, makes clear

that Plaintiffs' claims are preempted by the ADA.

---

[5] Courts have also applied ADA preemption to bar state law claims against other non-airline
defendants where the relationship between the defendants' conduct and airline prices was far more
indirect than it is here. *See, e.g., Marlow v. AMR Servs. Corp.*, 870 F. Supp. 295, 298 (D. Haw.
1994) (applying ADA preemption to bar claim against non-airline jet bridge operator under state
"whistleblower" statute, holding that "[t]he defendant need not be an air carrier so long as the state
laws which prohibit defendant's alleged wrongdoing 'relate to' airline routes, rates, or services");
*Huntleigh Corp. v. La. State Bd. of Private Sec. Exam'rs*, 906 F. Supp. 357, 361-62 (M.D. La.
1995) (applying ADA preemption to bar claim against non-airline contractor under state law
governing registration and training of private security officers performing pre-departure screening
at airports because it generally had a connection with airline "services").

**C.     Applying ADA Preemption to Bar Plaintiffs' Claims Is Consistent with the Purpose of the ADA**

Plaintiffs have also argued that applying preemption to bar their state law claims would "undermine the purpose of the ADA" in two ways: (1) it would allow Defendants' alleged conduct to escape review; and (2) it would have the "unintended effect" of interfering with "competitive market forces" and "stifl[ing]" competition among airlines. (ECF No. 131, at 3.) Neither argument has merit. In fact, applying ADA preemption to bar Plaintiffs' state law claims would *further* the express purpose of the ADA preemption provision—to ensure a single federal regulatory structure for enforcement of any law related to, having a connection with, or referring to airline prices, routes, or services.

**1.     Allowing Plaintiffs' Claims to Proceed Would Be Inconsistent with the ADA's Mandate of a Single Federal Regulatory Scheme**

The purpose of the ADA's preemption provision is to have all claims "relate[d] to" airline prices, routes, or services subject to a uniform set of federal laws, not to varying (and, potentially, conflicting) state laws that "undo federal deregulation with regulation of their own." *Morales*, 504 U.S. at 378. To this end, "[t]he legislative history of federal efforts to regulate [GDS] services and uses clearly demonstrates that the preemption statute should be applied to eliminate the risk that [GDS] providers could be subject to varying state standards of unlawful competition." *Frontier*, 758 F. Supp. at 1409. The *Frontier* court recognized that Congress intended the preemption provision to apply to claims against GDSs to "insure[] a uniform system of regulation. . . . If there was no Federal regulation, the states might begin to regulate these areas, and the regulations could vary from state to state." *Id.* (quoting H.R. Rep. No. 98-783, 98th Cong., 2d Sess. 4 (1984), reprinted in 1984 U.S.C.C.A.N. 2857); *see also In re Air Cargo Shipping Servs. Antitrust Litig.*, 697 F.3d 154, 160 (2d Cir. 2012) (recognizing the purpose of ADA preemption provision was to "resolve[] 'uncertainties and conflicts' in the law created by conflicting or overlapping regulations

12

issued by the federal and state governments") (quoting H.R. Rep. No. 95–1211 at 16 (1978), reprinted in 1978 U.S.C.C.A.N. 3737, 3751); *In re Korean Airlines Co., Ltd. Antitrust Litig.*, 642 F.3d 685, 694 (9th Cir. 2011) ("'[F]ederal regulation insures a uniform system of regulation and preempts regulation by the states' . . . .") (quoting H.R. Rep. No. 98–793, at 4 (1984), reprinted in 1984 U.S.C.C.A.N. 2857, 2860).[6]

Allowing Plaintiffs' state law claims to proceed would be contrary to this purpose, and require the Court and fact finder to apply the laws of 30 separate states to Defendants' alleged conduct, potentially leading to conflicting outcomes between federal and state law, and among the laws of the various states. It would, in short, undermine Congress's intent in enacting ADA's preemption provision.

### 2.   Applying ADA Preemption Would Not Allow the Alleged Conduct to Escape Review

Plaintiffs' assertion that applying ADA preemption would "protect" Defendants from any legal review of their allegedly anticompetitive conduct is incorrect. (ECF No. 131, at 3). The ADA bars only Plaintiffs' state law claims; not their federal antitrust claim, which is based on the same factual allegations.

Moreover, Plaintiffs acknowledge that the "victims" of the claimed conspiracy—the airlines—have already pursued "related proceedings [*under federal law*] concerning precisely the

---

[6] Consistent with these cases, the ADA expressly confers upon the United States Department of Transportation ("DOT") the authority to regulate GDSs in light of the "critical role in airline distribution" GDSs play. *See* Computer Reservations System (CRS) Regulations, 69 Fed. Reg. 976, 996 (Jan. 7, 2004). Such authority includes DOT's responsibility for determining whether a GDS has "engaged in an unfair or deceptive practice or an unfair method of competition in air transportation or the sale of air transportation." *See* 49 U.S.C. § 41712(a). And the very next provision of the ADA preempts *any* state law that may interfere with the federal regulatory authority relating to airline prices, routes, and services. *See* 49 U.S.C. § 41713(b). As the court concluded in *Lyn-Lea*, "[t]he existence of federal regulations regarding [GDS] services . . . provide additional support for the conclusion that the ADA preempts claims [against GDSs]." 283 F.3d at 288.

13

same alleged misconduct" on which Plaintiffs base their claims here. (*Id.* at 1.)[7] Thus, whether Plaintiffs' allegations have any merit can be determined under federal law as Congress intended.

### 3.   Preemption Applies to Claims Alleging Harm to Competition

There also is no merit to Plaintiffs' assertion that, "to find preemption, the Court would have to hold that the ADA—which is designed to promote competition among airlines—has the unintended effect of protecting collusive oligopolists whose conduct stifles precisely such competition." (ECF No. 131 at 3.) The courts have applied the ADA to preclude a wide range of legal claims having a connection with airline prices, routes, and services *regardless whether such claims alleged anticompetitive conduct.*

Courts have, in fact, consistently dismissed as preempted claims under state consumer protection and antitrust laws, including claims—like here—alleging that the defendants' anticompetitive conduct resulted in airline ticket prices being artificially inflated. For example, in *In re Air Cargo Shipping Services Antitrust Litig.*, the Second Circuit affirmed the dismissal of state-law antitrust claims against foreign air carriers relating to alleged price-fixing of airline surcharges and rates, holding that the claims were preempted by the ADA because they "undoubtedly arise under state law and are related to 'price.'" 697 F.3d at 157-58, 164.[8] This Court should likewise dismiss Plaintiffs' state law claims because they are preempted by the ADA.

---

[7] As discussed above, US Airways' 2011 lawsuit against Sabre alleges the same Sherman Act conspiracy Plaintiffs allege here. *See US Airways v. Sabre.* American Airlines made similar claims in Texas. *See American Airlines*, 2011 WL 13047291, at *2 (federal antitrust claims alleged against Sabre and Travelport).

[8] *See also In re Korean Airlines*, 642 F.3d at 697 (affirming dismissal of price-fixing claims brought under various state antitrust and unfair competition laws as "plainly related to a price of an air carrier"); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 872 F. Supp. 52, 66 (S.D.N.Y. 1994) (dismissing an airline's claims against another for alleged "sharp practices to lure away customers," which was "within the broad meaning of 'rates, routes or services'"); *In re EVIC Class Action Litig.*, Nos. M-21-84, MDL-1339, 00-CIV-3811 (RMB), 02-CIV-2703 (RMB), 2002 WL 1766554, at *7-8 (S.D.N.Y. Jul. 31, 2002) (state law unfair competition and consumer protection claims preempted by the Federal Aviation Administration Authorization Act, "applied in

## II.   PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS

Plaintiffs' state and federal antitrust claims should be dismissed in their entirety because Plaintiffs lack antitrust standing to assert those claims, and their state law consumer protection claims should be dismissed for similar reasons. The Amended Complaint alleges, at best, a remote and speculative connection between Defendants' alleged conspiracy involving GDS services and Plaintiffs' alleged injuries involving their purchase of airline tickets. Plaintiffs do not claim they purchased, or even used, the GDS services at the center of the alleged conspiracy. Instead, they claim to have purchased a different service—tickets for air travel—from the airlines. (AC ¶¶ 2, 37, 42-117, 375.)

To get from the alleged GDS conspiracy to Plaintiffs' claimed injury from the purchase of airline tickets requires a series of speculative leaps involving the impact of certain contract terms on potential new competitors and on the GDSs' pricing, as well as the degree to which airlines pass on (or do not pass on) costs to travelers under a virtually infinite number of scenarios. In other words, despite the recognized complexities of airline ticket pricing, Plaintiffs allege that airlines uniformly raised their prices on every ticket sold because of the allegedly higher GDS fees, regardless of the specific airline, route, market share, competition, or supply and demand conditions. (*Id.* ¶¶ 2, 34, 36, 363.)

The Supreme Court, however, has made clear that the antitrust laws are not intended to provide recovery for every way in which an alleged antitrust violation somehow, some way, somewhere down the line may have affected the ultimate price the consumer paid for some good or service. *Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519,

---

an identical manner" to the ADA); *A.I.B. Express, Inc. v. FedEx Corp.,* 358 F. Supp. 2d 239, 251 (S.D.N.Y. 2004) (dismissing "all of [plaintiff]'s state law claims" as preempted by the ADA); *Hallam v. Alaska Airlines, Inc.,* 91 P.3d 279, 287-88 (Alaska 2004) (affirming dismissal of state law antitrust and unfair trade practices claims as preempted by the ADA).

534-35 (1983) (hereinafter "*AGC*") ("Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation") (internal citation omitted).

Rather, an antitrust plaintiff must have "antitrust standing," which is a distinct requirement from Article III standing. In addition to pleading that one has suffered an injury in fact from an alleged antitrust violation, an antitrust plaintiff must also establish that he is a "proper party to bring a private antitrust action." *AGC*, 459 U.S. at 535 n.31. At its core, antitrust standing bars claims by plaintiffs—such as those here—whose alleged injuries are too remote from the alleged misconduct, too speculative, or too derivative of injuries caused to other potential plaintiffs.

### A.   The Test for Antitrust Standing

####    1.    State and Federal Courts Impose Threshold Standing Requirements Based on The *AGC* Factors and Related Concepts of Proximate Cause

Antitrust standing "is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75-76, 78 (2d Cir. 2013) (affirming dismissal of claims where alleged injuries were only "indirectly related to the primary violation asserted," speculative, and better vindicated by other potential plaintiffs); *see also Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 290-95 (2d Cir. 2006) (same).[9] The requirement that a plaintiff establish antitrust standing at the pleading stage is important for several reasons, not least of which is that "[p]rivate antitrust litigation can be enormously expensive." *Bell Atl. Corp. v.*

---

[9] Principles of antitrust standing apply with equal force to Plaintiffs' claims for injunctive relief, with the only difference in application being that the difficulty of tracing damages is less important. Here, Plaintiffs' remoteness from the alleged harm to competitors, the speculativeness of their injuries, and the presence of "better" antitrust plaintiffs challenging the same conduct on the same theory establish the Plaintiffs' lack of standing. *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 437 (2d Cir. 2005) ("The same logic applies to claims for injunctive relief under Section 16 of the Clayton Act.").

*Twombly*, 550 U.S. 544, 573 (2007). The interests of judicial economy are best served by requiring antitrust plaintiffs to adequately plead antitrust standing before a court "allow[s] a potentially massive factual controversy to proceed." *AGC*, 459 U.S. at 528 n.17.

The concepts underlying antitrust standing are well established under both federal and state law: an injury cannot be remote or speculative, but instead must have been proximately caused by the alleged violation. As the Second Circuit has recognized, under *AGC*:

> [j]ust as in common-law tort and contract litigation, concepts such as "foreseeability and proximate cause, directness of injury, certainty of damages, and privity of contract" circumscribe a party's right to recovery, so in antitrust actions "the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them," can limit the right to sue.

*Daniel*, 428 F.3d at 437 (*citing AGC*, 459 U.S. at 532-33, 535-36); *see also Paycom Billing Servs.*, 467 F.3d at 290 (same); *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 480, 483 n.98 (S.D.N.Y. 2012) (same). The Supreme Court in *AGC* identified five relevant factors (now known as the "*AGC* factors") courts should consider in assessing whether a plaintiff has antitrust standing. As summarized by the Second Circuit, these factors are:

> (1) whether the plaintiff's alleged injury "is of the type that the antitrust statute was intended to forestall,"[10] (2) "the directness or indirectness of the asserted injury," (3) the extent to which the plaintiff's asserted damages are speculative; (4) "the potential for duplicative recovery or complex apportionment of damages," and (5) "the existence of more direct victims of the alleged conspiracy."

*Gatt Commc'ns*, 711 F.3d at 76.

---

[10] Under this requirement, referred to as "antitrust injury," the plaintiff must prove "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). A showing of antitrust injury "is necessary, but not always sufficient to establish standing under [Clayton Act] § 4, because a party may have suffered antitrust injury but may not be the proper plaintiff under § 4 for other reasons." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 & n.5 (1986); *Paycom Billing Servs.*, 467 F.3d at 290 ("Even if a plaintiff adequately alleges an antitrust injury, it may still be held to lack standing. . . . Other factors relevant to standing—sometimes referred to as the 'efficient enforcer' factors—may 'indicate that a party who states an antitrust injury is nevertheless not a proper antitrust plaintiff.'") (internal quotation omitted).

Most states under which Plaintiffs bring their claims have explicitly adopted some or all of the *AGC* factors. *See, e.g., Southard v. Visa U.S.A., Inc.*, 734 N.W.2d 192, 198 (Iowa 2007) ("[W]e apply the *AGC* factors to determine whether the plaintiffs may recover under Iowa law."); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1087, 1088-89 (N.D. Cal. 2007) ("[P]laintiffs here proceeding under the Cartwright Act are required to satisfy general antitrust standing requirements enunciated by the Supreme Court in *AGC*.").[11] The remaining states that have addressed antitrust standing nonetheless require plaintiffs to satisfy the central tenets of proximate causation and non-remoteness as determined by an inquiry into the causal chain between the alleged conduct and injury.[12]

However, as discussed below, regardless of whether a given state has adopted the *AGC* factors or the related proximate cause requirement, the allegations in Plaintiffs' Amended Complaint demonstrate that they lack antitrust standing to pursue these claims.

### 2. Antitrust Standing Requirements Are Not Diminished by a State's "Repeal" of the Federal *Illinois Brick* Doctrine

Plaintiffs have not brought federal damages claims because they recognize any such claim would be barred under the doctrine of *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), which generally allows only the direct purchaser of a good or service to sue for "overcharge" damages.

---

[11] Other states take the same approach. *See* Appendix, Table 1, listing cases.

[12] *See* Appendix, Table 1. Only one state under which Plaintiffs' seek relief, Minnesota, has expressly declined to follow the specific *AGC* factors in analyzing standing under its state antitrust law. Nonetheless, Minnesota still limits who has standing to bring an antitrust claim, including barring claims for remote injuries that are not proximately caused by the alleged anticompetitive conduct. *See Lorix v. Crompton Corp.*, 736 N.W.2d 619, 631 (Minn. 2007) (requiring "some prudential limits informed by foreseeability, proximate cause, remoteness, and relation of the injury to the purposes of the antitrust law; otherwise, almost any antitrust violation would provide almost any citizen with a cause of action arising from the resulting ripples of harm throughout the state's economy."). Thus, the substance of Minnesota's antitrust standing requirement is consistent with the laws of other states identified in Plaintiffs' complaint and federal law.

Seeking to avoid that bar, Plaintiffs bring their claims for damages under the laws of states that they believe have "repealed" (judicially or legislatively) the federal *Illinois Brick* doctrine.

But a state's "repeal" of the *Illinois Brick* doctrine does not relieve Plaintiffs of their obligation to plead and prove that they have antitrust standing under state antitrust law. As the Supreme Court pointed out, the "question of which persons have been injured by an illegal overcharge for purposes of [Clayton Act] § 4," which is addressed by the *Illinois Brick* doctrine, is "analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages under § 4." *Illinois Brick*, 431 U.S. at 728 n.7; *see also, e.g., Loeb Indus., Inc. v. Sumitomo Corp.,* 306 F.3d 469, 475 (7th Cir. 2002) ("We find that *Illinois Brick* presents no obstacle to any of the plaintiffs' claims but that the claims of the scrap copper dealers are precluded under *AGC*."). Therefore, even in states that have repealed *Illinois Brick*, an antitrust plaintiff must still satisfy the requirements of antitrust standing.[13]

---

[13] In addition to a lack of antitrust standing, Plaintiffs' claims are separately barred by antitrust statutes in Illinois and Tennessee. The Illinois Antitrust Act expressly bars private class action antitrust claims brought by plaintiffs, such as those here, that are not direct purchasers. *See* 740 Ill. Comp. Stat. Ann. 10/7(2) ("Provided further that *no person shall be authorized to maintain a class action* in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General, who may maintain an action *parens patriae* as provided in this subsection.") (emphasis added); *see also In re Wellbutrin Antitrust Litig.*, 756 F. Supp. 2d 670, 676-77 (E.D. Pa. 2010) (denying leave to amend to add an Illinois antitrust class action claim because the putative class members were not direct purchasers). Similarly, the Tennessee Trade Practices Act, T.C.A. § 47-25-101 *et seq.*, applies only to allegedly anticompetitive agreements regarding "tangible goods, not intangible services." *Bennett v. Visa U.S.A. Inc.*, 198 S.W. 3d 747, 751 (Tenn. Ct. App. 2006) (citing *McAdoo Contracts, Inc. v. Harris*, 439 S.W.2d 594 (Tenn. 1969)). Plaintiffs' claim fails as a matter of Tennessee law because the challenged conduct here relates to the provision of intangible "GDS services." (*See, e.g.*, AC ¶¶ 2, 122, 129, 133.) Allegations that the allegedly anticompetitive conduct has the effect of raising the cost of air travel cannot save Plaintiffs' claim since air travel is itself a service, and, even if it were not, the TTPA still would not apply. *See Bennett*, 198 S.W. 3d at 753 ("The cost of these services, like all production costs, influence the price at which such businesses sell their products. The TTPA cannot be asserted every time product prices are influenced by anti-competitive conduct in the service industries without effectively expanding the TTPA's scope to include those service industries. Such an implicit expansion of the TTPA's scope would be in direct contravention of the Tennessee Supreme Court's interpretation [of the Act] . . . .").

**B.      Plaintiffs' Federal and State Antitrust Claims Are Too Remote and Speculative, and Are Better Prosecuted by Others**

Plaintiffs' own allegations establish that their alleged injury is too remote from the allegedly anticompetitive conduct, and their claimed injuries too speculative, to give them antitrust standing. Moreover, the better plaintiffs—the airlines that Plaintiffs say are the victims of the alleged conspiracy—are pursuing these same claims. *See Gatt Commc'ns*, 711 F.3d at 75-82 (affirming dismissal of claims where alleged injuries were only "indirectly related to the primary violation asserted," speculative, and better vindicated by other potential plaintiffs).[14] Under such circumstances, Plaintiffs claims must be dismissed for lack of antitrust standing.

**1.      Courts Consistently Dismiss Similar Claims for Lack of Standing**

In applying the *AGC* factors to this case, the Court need not write on a blank slate. Putative classes of consumers have brought numerous cases challenging alleged antitrust violations in the credit/debit card industry, raising questions of standing closely analogous to those presented here. In those cases, putative classes of consumer plaintiffs alleged that payment card networks (*e.g.*, Visa and Mastercard) engaged in anticompetitive conduct that inflated the card-processing fees paid by merchants (*e.g.*, Walmart), who in turn passed on their increased costs from those fees in the form of inflated prices for the goods and services they sold to the consumer plaintiffs. *See, e.g., Crouch v. Crompton Corp.,* No. 02 CVS 4375, 2004 WL 2414027, at \*26-28 (N.C. Super. Ct. Oct. 28, 2004). Just as the plaintiffs alleged the payment networks inflated the fees they charge merchants for card-processing services, Plaintiffs here allege the GDSs inflated the fees they charge airlines for GDS services. And, like the credit card plaintiffs who claimed the

---

[14] *See also Paycom Billing Servs.*, 467 F.3d at 290-95 (same); *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 14 (2d Cir. 1980) (antitrust claims dismissed where claimed injury was "too tenuous and conjectural").

goods they bought *from the merchants* cost more, Plaintiffs here claim the tickets they bought *from the airlines* cost more.

State and federal courts have consistently dismissed those cases for lack of antitrust standing because of the same failure to satisfy the essential requirements of the *AGC* analysis that bar Plaintiffs' claims here. Specifically, courts have consistently held that these plaintiffs lack standing under state law for some or all of the following reasons: (1) the plaintiffs' claimed injuries were too remote because, like Plaintiffs here, they were not purchasers (either direct or indirect) of the defendants' services; (2) the plaintiffs' alleged injuries were too speculative because they hinged on innumerable factors involved in the pricing by merchants of the goods and services they sold (like the complex pricing by airlines of their tickets); and (3) the claims were derivative of harm to other victims (the merchants, like the airlines here) who were more "efficient enforcers" capable of vindicating any antitrust concerns raised by the challenged conduct. *See, e.g., Crouch,* 2004 WL 2414027, at *26-28; *Ho v. Visa U.S.A., Inc.,* No. 112316/00, 787 N.Y.S.2d 677, 2004 N.Y. Misc. LEXIS 577, at *2 (N.Y. Cty. Super. Ct., N.Y. Apr. 21, 2004), *affirmed* by 793 N.Y.S.2d 8 (N.Y. App. Div. 2005); *Peterson v. Visa U.S.A., Inc.,* No. Civ.A. 03-8080, 2005 WL 1403761, at *2, 5 (D.C. Super. Ct. Apr. 22, 2005).[15]

Plaintiffs' claims here should be dismissed for the same reasons—Plaintiffs are not purchasers of GDS services (directly or indirectly), their alleged injury is remote and speculative, and other "efficient enforcers" have already challenged the conduct at issue.

---

[15] *See also infra* cases cited in Section II.B.2-4. *Additionally see also Beckler v. Visa U.S.A., Inc.,* CIV. 09-04-C-00030, 2004 WL 2475100, at *3-4 (N.D. Dist. Ct. Sept. 21, 2004); *Beckler v. Visa U.S.A., Inc.,* No. 09-04-C-00030, 2004 WL 2115144, at *3 (N.D. Dist. Ct. Aug. 23, 2004); Tr. of Mot. Hr'g 54:4-55:1, *Cornelison v. Visa U.S.A., Inc.,* No. Civ. 03-1350 (S.D. Cir. Ct. Sept. 28, 2004) (attached hereto as Kaiser. Decl. Ex. A); *Goldberg v. Visa U.S.A., Inc.,* No. 04 CA 0005158, 2007 WL 2011732 (D.C. Super. Ct. Mar. 2, 2007).

2.      **Plaintiffs' Injuries Are Too Remote to Give Rise to Antitrust Standing**

Plaintiffs do not allege they purchased the GDS services purportedly affected by the

claimed conspiracy. Instead, Plaintiffs purchased airline tickets, which they bought from the

airlines—either directly or through travel agencies—not the GDSs. (*See* AC ¶¶ 42-117.)  The

payment card cases make clear that plaintiffs that did not purchase the service purportedly affected

by the alleged antitrust violation lack standing:

> The plaintiffs in the present action [do not have standing] because they did not purchase,
> directly or indirectly, the product that is the subject of anticompetitive activity by Visa
> and MasterCard—debit processing services.  It is clear from the petition that the plaintiffs
> are nonpurchasers; they simply bought merchandise from businesses that used the
> defendants' debit processing services.

*Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192, 196-97 (Iowa 2007).  Like the consumers in

*Southard*, Plaintiffs here are *non-purchasers*—and not even indirect purchasers—of the

Defendants' services.  Where, as here, a plaintiff "is actually a 'non-purchaser'" of the defendant's

services and claims injury from purchases of goods or services "not even manufactured or sold by

defendants," the plaintiff's injuries are "derivative and remote" and he does not have antitrust

standing.  *Stark v. Visa*, No. 03-055030-CZ, 2004 WL 1879003, at *4 (Mich. Cir. Ct. July 23,

2004).

To the extent the airlines incurred any increase in prices for GDS services as a result of the

alleged conduct, any connection between such an increase and the prices the airlines then chose to

charge passengers is too remote to give rise to antitrust standing.  As several courts have held in

the credit/debit card cases, Plaintiffs' "alleged harm caused by Defendants' [allegedly

anticompetitive] scheme takes an abrupt left turn after reaching the merchants [airlines] and

branches off into supposed higher prices for all goods [airline tickets] . . . mutating into a different

form of harm to consumers.  Plaintiff's injury is better characterized as remote or derivative."

*Nass-Romero v. Visa U.S.A. Inc.*, 279 P.3d 772, 779 (N.M. Ct. App. 2012).

The dispositive standing defect is most stark with respect to Plaintiffs who purchased tickets directly from the airlines. For those tickets, *even the airline* did not purchase any GDS services. When an airline sells a ticket directly—on its website or through a call center, without involving a GDS—the airline performs its own processing, marketing, and servicing, and does not pay any fee to the GDS. (AC ¶ 3 (acknowledging the airlines pay a GDS fee only when a ticket is "booked by a travel agent that uses a GDS")). Thus, for the majority of the ticket purchases at issue, GDSs were not used in any way and the airlines did not pay any GDS booking fee (inflated or otherwise).

Ultimately, however, standing does not turn on whether Plaintiffs booked through a travel agent or directly from an airline. Even Plaintiffs that bought their airline tickets through a travel agency did not purchase—from the airline or otherwise—any GDS services. These Plaintiffs thus lack standing to bring the claims they assert here, just as consumers who purchased goods using their payment cards (but never purchased the allegedly anticompetitive card processing services) lacked standing to bring claims for overpaying for those goods. *See Fucile v. Visa U.S.A., Inc.*, No. S1560-03 CNC, 2004 WL 3030037, at *5 (Vt. Super. Ct. Dec. 27, 2004) (rejecting proposed class of debit card users, finding "[w]hether [Plaintiff] used a debit card, a credit card, a check, or cash is irrelevant. His injury would still be that of a general consumer, and he would lack standing"); *Peterson*, 2005 WL 1403761, at *2, 5 (consumer plaintiffs lack standing where they were not direct or indirect purchasers of the defendant credit card company's services, but rather bought goods from the merchants who purchased the defendant's services); *Consiglio-Tseffos v. Visa U.S.A., Inc.*, No. CV 2003-020170, 2004 WL 3030043, *1 (Ariz. Super. Ct. Dec. 8, 2004) ("The services sold by Defendants are the right to use Mastercard's and Visa's debit and credit services. The Plaintiffs do not purchase those services."). In short, Plaintiffs have no more standing to sue the GDSs under these circumstances than they would to sue any other technology

23

provider, airframe manufacturer, advertising firm, or other service provider alleged to have engaged in anticompetitive conduct that affected the prices of goods or services sold to the airlines, but not Plaintiffs.

Plaintiffs' claims are too remote to satisfy the antitrust standing requirements for another independent reason as well. Their claims are based on the allegation that the GDSs' "full content" agreements reduced the ability of potential GDS competitors to compete for the airlines' business. (*See* AC ¶¶ 321, 343.) The alleged harm to Plaintiffs, therefore, is derivative not only of the alleged injury to the airlines from purportedly overpaying for GDS services (as Plaintiffs did not purchase any such services), but it is one step further removed in that it depends on the impact of the alleged conspiracy on GDS alternatives. Any benefit to Plaintiffs flowing from the elimination of the allegedly anticompetitive contract provisions, therefore, would be doubly-derivative of (1) the alleged benefit to the GDS competitors of having access to unique content, and then (2) the alleged benefit to the airline of allegedly having additional options in the market for airline ticket distribution. The Second Circuit in *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, *supra*, has dismissed such claims for lack of antitrust standing.

In *Paycom*, the court held that any claim based on the alleged anticompetitive effects on a competitor in a market in which the plaintiffs do not participate—*e.g.*, the suppliers of GDS services—is too remote to confer antitrust standing. 467 F.3d at 294 ("[E]limination of the [challenged contractual provisions] would have benefitted Paycom only through the increased use of Discover and American Express. Consequently, any injury suffered by Paycom was indirect and flowed from the injuries suffered by Discovery and American Express."). As in *Paycom*, because Plaintiffs' purported benefit from the elimination of the alleged anticompetitive conduct

would only be "through the increased use" of GDS competitors by the airlines, Plaintiffs claims

are too remote as a matter of law.  *Id.*[16]

### 3.    Plaintiffs' Injuries Are Too Speculative to Give Rise to Antitrust Standing

Plaintiffs' claims are also too speculative to give rise to antitrust standing.  The alleged

causal nexus between the claimed conspiracy and the posited injury to these Plaintiffs requires

several logical leaps of the kind that typically preclude antitrust standing.  *See, e.g., Laydon v.

Mizuho Bank, Ltd.*, No. 12-cv-3419 (GBD), 2014 U.S. Dist. LEXIS 46368, at *32 (S.D.N.Y. Mar.

28, 2014) (dismissing claims for lack of standing where harm was "four discrete links" away from

the alleged violation); *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 14 (2d Cir.

1980) (antitrust claims dismissed where claimed injury was "too tenuous and conjectural").

Plaintiffs' claims about the impact of higher GDS fees on all airline ticket prices involve

multiple layers of speculation, any one of which would, in itself, fatally undermine standing.  As

an initial matter, Plaintiffs' claims depend on the speculation that the conspiracy to demand full

content from airlines somehow excluded various "alternative distribution" channels which in turn

inflated the prices airlines paid for GDS services.  (*See* AC ¶¶ 165, 321, 343-44.)  Under *Paycom*,

by itself, this is too speculative to support antitrust standing.  467 F.3d at 293 (finding plaintiff's

claim "highly speculative" where "[n]o one can state that, absent the [contractual restraint],

increased competition from Discover and American Express would have forced MasterCard to

adopt policies more favorable to Paycom").

---

[16] In a similar vein, the Second Circuit requires the allegedly injured party at least to be a participant in the market alleged to be target of the anticompetitive acts. *See, e.g., Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 78 (2d Cir. 1998) ("The requirement that the alleged injury [to plaintiff] be related to anti-competitive behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged malefactors.") (internal citations omitted).  Here, Plaintiffs do not allege they participate in the market for distribution of air fare and schedule information, nor could they.

Putting that issue to one side, Plaintiffs' claims are far too speculative because they depend on the premise that every ticket, on every route, sold by almost every major airline included an "overcharge" directly correlating to the allegedly "supracompetitive" GDS fees, no matter how that ticket was purchased—even though the airlines did not pay any GDS fee (inflated or otherwise) for the majority of those tickets (which were booked directly with the airlines). As in the payment card cases, assessing "what portion of any overcharge was passed on by any given merchant [airline], with respect to which products [tickets/routes/seats], and to which consumers is a task of monumental uncertainty and complexity." *Knowles v. Visa U.S.A., Inc.*, No. Civ.A. CV-03-707, 2004 WL 2475284, at *6 (Me. Super. Ct. Oct. 20, 2004); *see also Nass-Romero*, 279 P.3d at 779 (finding plaintiffs' claim too speculative where the assumption that merchants passed on payment card fees would cause the Court to "ignore the countless considerations that go into the set price of any given product [here, airline ticket] at any given store [here, airline] on any given day").

The speculative nature of Plaintiffs' causation theory is even greater here due to the unique way in which airlines price air travel. "As the Supreme Court [has] recognized . . . airline fares pricing is based on 'yield management,' a unique formula largely controlled by the forces of demand and competition, not cost." *Abdu-Brisson v. Delta Airlines, Inc.*, 128 F.3d 77, 84-85 (2d Cir. 1997) (citing *Morales*, 504 U.S. at 389). Plaintiffs' conclusory allegations that GDS fees were simply passed on to each and every plaintiff, regardless of how she bought her ticket, are far too speculative to establish antitrust standing. This is especially true given the enormous complexity inherent in airline pricing, and, in particular, the wildly divergent supply and demand conditions affecting airline pricing on their many thousands of different routes and the other factors inducing

pricing variations—by fare class, seat, time of purchase, etc.[17]  *Id.*; *cf. Fucile*, 2004 WL 3030037, at *4 ("Finally, the alleged damages are highly speculative. Assuming that the merchants actually passed along added expenses in the price of goods sold, the court would need to determine the degree to which these expenses were passed along. This degree may vary from one good to another.").  While proof of damages is often complicated for direct purchasers who have "immediate proximity in the chain of distribution," that involves "far less likelihood that a multitude of other pricing factors will at the very best cloud, if not obliterate, the connection between the prohibited conduct and the claimed injury." *Strang v. Visa U.S.A., Inc.,* No. 03 CV 011323, 2005 WL 1403769, at *5 (Wis. Cir. Ct. Feb. 8, 2005).

For these reasons, courts in the closely analogous credit/debit cards cases have routinely dismissed damages claims by end consumers as speculative. "As a general consumer or debit card consumer, Ms. Strang's claimed injuries are derivative and too remote; they are also highly speculative, potentially duplicative and would clearly involve daunting and overwhelming evidentiary concerns." *Strang*, 2005 WL 1403769, at *1.[18]  The same result holds here. No matter the route, fare class, date, time, competition, or numerous other factors that differentiate the ticket purchases at issue, Plaintiffs claim that "anyone that came in and bought any [airline ticket] is

---

[17] It is obvious, for instance, that a last-minute purchase of a first class seat on a United flight from Los Angeles to New York for travel around Christmas is priced differently than an advanced-purchase coach seat on a JetBlue flight from Charlotte to Boston for summertime, mid-day, mid-week travel. Nonetheless, Plaintiffs allege that a single "overcharge" from GDS fees charged to airlines for tickets purchased through travel agents was passed through to these and *all tickets purchased* during the relevant time period, regardless of any factor differentiating the products or relevant market conditions. (AC ¶ 34.)

[18] *See also Gutzwiller v. Visa U.S.A., Inc.,* C4-04-58, 2004 WL 2114991, at *9 (Minn. Dist. Ct. Sept. 15, 2004) ("The Court agrees with Defendants assertion that Plaintiff's damages claims are inherently speculative.") *abrogated on other grounds* by *Lorix*, 736 N.W.2d 619, 632 (Minn. 2007) ("*Gutzwiller* . . . does provide an example of an injury that is most likely too remote and speculative to afford standing.").

damaged." Nov. 5, 2015 Hr'g Tr. 42:21-22, ECF No. 135. This theory of causation is too speculative to confer standing as a matter of law.

### 4.    There Are "Better Plaintiffs"

Plaintiffs also lack antitrust standing because the airlines—which are pursuing the same claims—are more "efficient enforcers" of the antitrust laws, and thus the "better plaintiffs." *See AGC*, 459 U.S. at 542. Although Defendants believe the claims have no merit, two of the airlines identified in Plaintiffs' Amended Complaint—US Airways and American Airlines—brought antitrust conspiracy claims based on "precisely the same alleged misconduct" years before Plaintiffs filed this Complaint. (ECF No. 131, at 1.)

To the extent there is any valid claim to pursue on these facts (which there is not), the airlines that actually purchased the allegedly anticompetitive GDS services and paid the allegedly "supracompetitive" GDS fees are the appropriate parties to pursue the alleged antitrust violations set forth in the Amended Complaint. *See Paycom*, 467 F.3d at 294 (denying standing because another case by a better-situated plaintiff "addressed the exact violation now asserted by Paycom"); *Nass-Romero*, 279 P.3d at 779 (affirming dismissal of consumer claims partly because "[t]he better plaintiffs to challenge Defendants' business practices have already come forward. They are the merchants themselves."); *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 297-99 (Neb. Sup. Ct. 2006) (same).

### C.    Plaintiffs' Consumer Protection Claims, to the Extent Not Otherwise Defective, Are Also Foreclosed Because They Are Remote and Speculative

Plaintiffs assert claims under the consumer protection statutes of six states—California, Illinois, Florida, Massachusetts, Missouri, and South Carolina. (AC ¶¶ 410-56.) Plaintiffs' claims should be dismissed either because they are not authorized in the first place or because they are, like Plaintiffs' antitrust claims, too remote and speculative.

*First*, Missouri, Massachusetts, and Illinois do not permit plaintiffs to evade the limits of their state antitrust statutes by pursuing the same claims under state consumer protection laws. Missouri follows *Illinois Brick* and its courts have expressly rejected what Plaintiffs seek to do here—repackage antitrust claims under the Missouri Merchandising Practices Act to avoid those limits on antitrust claims. *See Ireland v. Microsoft Corp.*, No. 00CV-201515, 2001 WL 1868946, at *1 (Mo. Cir. Ct. Jan. 24, 2001) ("The court finds that the case of *Illinois Brick Company v. The State of Illinois* is controlling and applicable to plaintiff's claims under the Missouri Antitrust Laws and the Missouri Merchandising Practices Act (MMPA).") (internal citation omitted). Massachusetts takes the same approach to claims filed under § 11 of the Massachusetts Consumer Protection Act. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C 07-5944 SC, 2014 WL 1088256, at *3 (N.D. Cal. Mar. 13, 2014). Similarly, Illinois law does not permit a plaintiff to file an antitrust claim under the guise of the Illinois Consumer Fraud and Deceptive Business Practices Act. *See Gaebler v. New Mexico Potash Corp.*, 676 N.E.2d 228, 230 (Ill. App. 3d Dist. 1996) (dismissing a consumer protection act claim because claims that are "covered by the Antitrust Act . . . must be brought under the Antitrust Act and not the Consumer Fraud Act."); *see also Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 993 (Ill. 1990) (holding that it would be "incongruous" to interpret the Consumer Fraud Act to provide a plaintiff with an antitrust claim the legislature decided not to allow under the Antitrust Act). Plaintiffs' consumer protection claims under Missouri, Massachusetts, and Illinois law fail.

*Second*, Plaintiffs' claims under the South Carolina Unfair Trade Practices Act must be dismissed because the statute expressly prohibits class action lawsuits for damages. *See* S.C. Code Ann. § 39-5-140 ("Any person who suffers any ascertainable loss of money or property . . . may bring an action individually, but not in a representative capacity, to recover actual damages."). As

29

the only claims brought by Plaintiffs are class action claims, the Illinois and South Carolina consumer protection putative class claims must be dismissed.

*Third*, Plaintiffs' remaining consumer protection act claims under California and Florida law, and under § 9 of the Massachusetts Consumer Protection Act, all must be dismissed because those statutes preclude claims where the alleged injury is remote or speculative. *See In re Dairy Farmers Antitrust Litig.*, No. 9-CV-3690, 2015 WL 3988488, *7-8 (N.D. Ill. June 29, 2015) (dismissing claims under California law); *Lombardo v. Johnson & Johnson Consumer Co.*, Civ. No. 13-06536-Civ-Scola, 2015 WL 5025466, at *6 (S.D. Fla. Aug. 12, 2015) ("Defendants' allegedly deceptive pricing practices are too remote and speculative to satisfy the causation element [under Florida law]."); *Gorbey ex. rel. Maddox v. Am. J. of Obstetrics & Gynecology*, 849 F. Supp. 2d 162, 165-66 (D. Mass. 2012) (dismissing a claim under § 9 of the Massachusetts Consumer Protection Act for failure to establish a causal link between plaintiff's alleged injury and defendants' conduct). For the reasons set forth above, the relationship between Plaintiffs' alleged injury and the Defendants' purported anticompetitive conduct is too remote and speculative to support any of Plaintiffs' consumer protection act claims. Dismissal is appropriate.

## III.   PLAINTIFFS' CLAIMS ARE TIME-BARRED

Each of Plaintiffs' state law damages claims should be dismissed because it is time-barred under the applicable statute of limitations, and Plaintiffs' federal Sherman Act injunction claim is barred under the doctrine of laches. No discovery is needed to reach this conclusion because the Amended Complaint, on its face, compels this result.[19]

---

[19] A motion to dismiss based on statutes of limitations and laches is proper where, as here, the defenses are apparent "on the face of the complaint." *See, e.g., McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004); *Klein v. Goetzmann*, 770 F. Supp. 78, 84 (N.D.N.Y. 1991) ("A statute of limitations defense may be properly raised on a motion to dismiss under Rule 12(b)(6)").

Plaintiffs allege that, beginning in 2006, Defendants conspired to impose a set of "contractual provisions on the Airlines." (AC ¶¶ 5-6.) According to Plaintiffs, the "crucial element" of the alleged conspiracy was a "Backstop Agreement" under which Sabre and Amadeus—but not Travelport—agreed to supply each other "with any content that any airline provided to only one of them." (AC ¶ 19.) Plaintiffs allege this agreement constitutes "direct evidence" of the claimed conspiracy. (AC ¶ 225; *see also* ¶¶ 19, 218, 226.)[20] But the Backstop Agreement was publicly announced in 2006. (AC ¶¶ 227, 236.) Further, the alleged conspiracy was "complete[d]" by early 2007, by which time each Defendant had negotiated and entered into separate full content agreements with the various airlines. (AC ¶¶ 236, 239.) Like the Backstop Agreement, these airline contracts, including the full content provisions, were publicly announced at or around the time they were entered. *Id.* Yet Plaintiffs waited approximately eight years to commence this action.

## A. Each of Plaintiffs' State Law Damages Claims Is Time Barred in Its Entirety by the Applicable Statute of Limitations

Antitrust causes of action "accrue[] and the statute [of limitations] begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971); *see also In re Air Cargo Shipping Servs. Antitrust Litig.*, Nos. 06-MDL-1775 (JG) (VVP), 10-CV-639 (JG) (VVP), 2010 WL 10947344, at *12-13 (E.D.N.Y. Sept. 22, 2010) (same). Unless "suit [is] commenced within [the statutory period] after the cause of action accrued," a claim is time barred. *Id.* The same is true of Plaintiffs' state law

---

[20]  Plaintiffs' failure to allege that Travelport was a party to this purportedly "crucial," "critical," and "particularly significant" agreement renders Plaintiffs' antitrust claims implausible not only with respect to Travelport, but the other Defendants as well. *See Twombly*, 550 U.S. at 569-70; *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (claims dismissed for failure to allege specific activities of each defendant); *Hinds County, Miss. v. Wachovia Bank, N.A.*, 620 F. Supp. 2d 499, 512-16 (S.D.N.Y. 2009) (specific facts must be alleged establishing the involvement of each defendant in the alleged conspiracy to satisfy *Twombly*).

consumer protection claims. *See, e.g., Karl Storz Endoscopy Am., Inc. v. Surgical Tech., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002) (statute of limitations on state law consumer protection claims begins to run from the date of accrual, not discovery); *McKissack v. Swire Pac. Holdings, Inc.*, No. 09-22086-Civ., 2010 WL 3701577, at *13-16 (S.D. Fla. Sept. 15, 2010) (same).

With limited exceptions, each of the state antitrust and consumer protection laws Plaintiffs invoke has a statute of limitations period of four years or fewer.[21] Those claims are therefore barred because the complaint was not filed until July 14, 2015—almost nine years after the alleged conspiracy is supposed to have been formed, and more than eight years after it allegedly was completed. *See Vitale v. Marlborough Gallery*, No. 93-Civ-6276 (PKL), 1994 WL 654494, at *4 (S.D.N.Y. July 5, 1994) ("When the anticompetitive act causing the injury and giving rise to the cause of action occurs outside of the statutory period, the claim is time barred.").

Plaintiffs seek to preserve their damages claims with conclusory allegations that Defendants "fraudulently concealed" the conduct underlying the claims, (AC ¶¶ 374-90), and that the alleged conspiracy "continued," (AC ¶¶ 391-394). Neither set of allegations avoids the statute of limitations bar.

### 1. Plaintiffs Fail to Establish the Elements of Fraudulent Concealment Necessary to Toll the Applicable Statutes of Limitations

Fraudulent concealment tolls the statute of limitations only if (1) the defendant concealed its actions; (2) the plaintiff lacked actual or constructive knowledge within the limitations period of the operative facts that are the basis of their cause of action; and (3) the plaintiff exercised due diligence in pursuing the discovery of its claim. *See In re Merrill Lynch Ltd. P'ship Litig.*, 154 F.3d 56, 60 (2d Cir. 1998). Fraudulent concealment must be pled with particularity. *Nat'l Grp.*

---

[21] The only state antitrust acts with statutes of limitations longer than 4-years are Vermont, Maine and Wisconsin, each of which has a 6-year statute. Missouri's consumer protection statute has a 5-year limitations period. *See* Appendix, Table 2. These claims are likewise barred because Plaintiffs waited at least eight years to bring them.

*for Commc'ns & Computers, Ltd. v. Lucent Techs. Inc.*, 420 F. Supp.2d 253, 265 (S.D.N.Y. 2006).

A plaintiff's burden in pleading these elements is "a 'heavy one.'" *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 232, 347 (D. Vt. 2010) (*citing among other authority, Grynberg v. ENI S.p.A.*, No. 06-Civ-6495, 2009 WL 2482181, at *5 (S.D.N.Y. Aug. 13, 2009) and *Buccino v. Cont'l Assurance Co.*, 578 F. Supp. 1518, 1523 (S.D.N.Y. 1983)). The allegations in the Amended Complaint fail to plead facts satisfying any of the three required elements.

*First*, the Amended Complaint and the public record establish that Plaintiffs had constructive notice of their claims as early as 2006, and no later than April 2011, despite Plaintiffs' conclusory allegation that they did not have notice "until March 12, 2015, when the files in the US Airways action…were unsealed and made public for the first time."[22] (AC ¶ 374.) In fact, the basic allegations in the Amended Complaint were public more than four years before it was filed.

Plaintiffs allege that in 2006, Defendants "began publicly stressing the importance of full content, thereby reinforcing the commitment to their scheme." (AC ¶¶ 215, 224, 236 242.) These allegations establish that Plaintiffs had constructive knowledge of the facts giving rise to their claim in 2006. *See Allen*, 748 F. Supp. 2d at 348 (statute of limitations not tolled for allegations that "were public information at the time . . . and were well known throughout the . . . industry") (quoting *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1051 (8th Cir. 2000)); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 188, 224 (E.D.N.Y. 2003) ("[D]isclosed facts in the public domain" were sufficient to put Plaintiffs on notice of their claim and prohibit reliance on fraudulent concealment).[23]

---

[22] While the summary judgment record in the US Airways case was unsealed in March 2015, the complaint, including the core allegations relevant to Plaintiffs' claims here, was publicly available starting in 2011.

[23] It is no answer for the Plaintiffs to claim that they were not on notice of every alleged fact, particularly when the actual contractual provisions about which they complain were well known. A plaintiff's knowledge of "[a]ny fact that should excite his suspicion is the same as actual

Any doubt that Plaintiffs had at least constructive knowledge of their claims outside of the statutory period is extinguished by the public record of complaints filed against GDSs in this District and other courts in early 2011. *See Am. Airlines, Inc. v. Travelport Ltd.*, No. 4:11-cv-244-Y (N.D. Tex. Apr. 12, 2011); *US Airways v. Sabre*, No. 11-cv-02725 (S.D.N.Y. Apr. 21, 2011). [24]

For example, Count IV of the US Airways complaint, filed on the public docket of this Court on April 21, 2011, is entitled "Horizontal Agreement among Sabre and other GDSs in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1." Mirroring Plaintiffs allegations here, US Airways alleged that "Sabre has agreed with other GDSs to limit competition for airline content by entering into an explicit agreement with Amadeus to not compete on content, agreeing with other GDSs on the meaning of terms such as 'full content,' seeking virtually identical content provisions, seeking joint negotiations with individual airlines on content, and engaging in joint retaliation against airlines that sought lower cost, more efficient alternatives." (Compl., *US Airways v. Sabre*, No. 11-cv-02725 (S.D.N.Y., Apr. 21, 2011).) The complaint also included factual allegations regarding the "back-up" content agreement, (*id.* ¶ 97), and ten pages of allegations essentially identical to those in the Amended Complaint regarding the GDSs pursuit of "full content" agreements, (*see id.* ¶¶ 98-132).

Plaintiffs concede that these public lawsuits involved "conduct of the type alleged here," (AC ¶ 160); *see also* ECF No. 131, at 1 (the lawsuits brought by American Airlines and US Airways involve "precisely the same alleged misconduct" that Plaintiffs allege here). The public

knowledge of his entire claim." *United States v. Island Park*, 791 F. Supp. 354, 370 (E.D.N.Y. 1992) (quoting *Dayco v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975)); *see also Wolf v. Wagner Spray Tech Corp.*, 715 F. Supp. 504, 509 (S.D.N.Y. 1989) ("Courts have held that facts that should arouse suspicion . . . are equated with actual knowledge of the claim.") (internal quotations and citations omitted).

[24] "[C]ourts routinely take judicial notice of documents filed in other courts" as well as other documents in the public domain when deciding a Rule 12(b)(6) motion to dismiss. *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

filing of the airline complaints alone was sufficient to, at a minimum, "arouse suspicion" as to the existence of Plaintiffs' claims. *See Wolf*, 715 F. Supp. at 509.

*Second,* Plaintiffs have not alleged any false statements by Defendants that could reasonably be construed as wrongfully concealing the challenged conduct. To the contrary, Plaintiffs affirmatively allege that each of the Defendants *publicly announced* both the "Backstop Agreement" and the airline full content agreements when they were signed, including the fact that those agreements provided for access to full content (i.e., the alleged "contractual restraint"). *(See, e.g.,* AC ¶¶ 215, 224, 242, 244-47, 271-75, 380, 382-84, 387-88.)

Plaintiffs' assertion that Defendants "misrepresented" the benefit to consumers from having access to "all Airline content" to allegedly "mask" the "impact" of the conspiracy, (AC ¶ 379), cannot save their fraudulent concealment argument. Statements of opinion about the consumer benefits flowing from full content cannot be fraudulent as a matter of law unless accompanied by factual allegations plausibly suggesting that the GDSs did not truly believe in the procompetitive benefits of the full-content provisions at the time these statements were made. *See, e.g., City of Omaha, Neb. Civilian Emp. Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67-68 (2d Cir. 2012) (dismissing securities fraud case for failure to allege that defendants did not believe statements regarding value of corporation's goodwill at the time they made them). No such allegations appear in the Amended Complaint; nor could they given the Amended Complaint's acknowledgment of the importance of such content to travel agents and travelers. (AC ¶ 4).[25]

*Third,* Plaintiffs' Amended Complaint contains no factual allegations regarding any "due diligence" Plaintiffs pursued to investigate the existence of their claims, which is likewise fatal to Plaintiffs' fraudulent concealment claim. *See In re Merrill Lynch,* 154 F.3d at 60 (declining to toll

---

[25] For the same reason Plaintiffs' allegations that Defendants denied having "negotiating leverage" or "pricing power" with the airlines are insufficient to establish fraudulent concealment. (*see* AC ¶¶ 385-86)

statute on the basis of fraudulent concealment when "[Plaintiffs] did not allege in the [complaint]

that they exercised due diligence; they make no allegation of any specific inquiries of [defendant],

let alone detail when such inquiries were made, to whom, regarding what, and with what

response").

### 2. Plaintiffs' Conclusory Allegations of a "Continuing Conspiracy" Do Not Preserve Their Damages Claims Based on Recent Purchases

Plaintiffs also attempt to circumvent the statutory bar to their damages claims by alleging

that even if their causes of action accrued long ago, the "continuing" nature of the alleged

conspiracy extends the applicable limitations periods. The allegations in the Amended Complaint,

however, fail to establish that the GDSs have taken any "new and independent acts" in furtherance

of the alleged conspiracy, as required to establish a continuing violation.

To plead a "continuing violation" a "plaintiff must allege an overt act [by a defendant]

which (1) is a 'new and independent act that is not merely a reaffirmation of a previous act'; and

(2) 'inflict[s] new and accumulating injury on the plaintiff.'" *Vitale*, 1994 WL 654484, at *5

(quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)). "[C]ourts in

this Circuit consistently have looked unfavorably on continuing violations arguments." *Vitale*,

1994 WL 654494, at *5; *see also In re Cipro*, 261 F. Supp. 2d at 228 (finding that "compelling

circumstances must exist before the limitations period will be extended" based on a continuing

violation argument) (internal quotations and citations omitted).

The natural consequences of earlier conduct do not qualify as "new and independent" acts

of the sort required to establish a "continuing violation." "'This distinction between new and

independent acts that inflict new and accumulating injury on the plaintiff (which restart the statute

of limitations), and unabated inertial consequences of previous acts (which do not) allows the

statute of limitations to have effect and discourages private parties from sleeping on their rights.'"

*Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-cv-230, 2014 WL 2610613, at *24 (D. Vt. June 11, 2014) (quoting *Midwestern Mach. Co. v. Northwest Airlines, Inc.,* 392 F.3d 265, 271 (8th Cir. 2004)); *see also Poster Exchange Inc. v. Nat'l Screen Servs. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975) (same).

Further, Plaintiffs cannot satisfy *Twombly* by simply making the "bald assertion" that the GDSs alleged conduct constitutes a continuing conspiracy. *See, e.g., Ryan v. Microsoft Corp.*, No. 14-CV-04634-LHK, 2015 WL 1738352, at *13-14 (N.D. Cal. 2015) (dismissing a continuing violation claim based on the plaintiffs' failure to satisfy *Twombly/Iqbal*); *Little Rock Cardiology Clinic, P.A. v. Baptist Health*, 573 F. Supp. 2d 1125, 1138 (E.D. Ark. 2008) (same). Rather, Plaintiffs must plead sufficient facts to demonstrate that any alleged GDS conduct within the statute of limitations period constitutes a series of "new and independent acts," as opposed to the on-going consequences of an alleged GDS conspiracy completed in 2007. *See Allen*, 2014 WL 2610613, at *24. This is a heavy burden, which Plaintiffs fail to meet. *See Vitale,* 1994 WL 654494, at *5.

Plaintiffs' primary allegation is that they "suffer a new cognizable injury" every time one of the GDSs charges an allegedly supracompetitive GDS fee and a Plaintiff allegedly pays a higher ticket price as a result. (*See* AC ¶ 392.) Thus, the Amended Complaint alleges, at most, injury flowing from the natural "consequences" of the full content agreements, which memorialized the complained-of GDS fees *outside* the limitations period. This is not enough; actions carried out in compliance with a pre-existing contract do not constitute new and independent overt acts, but rather are the "inertial consequences" of the GDSs' alleged insistence on such agreements. *See Allen*, 2014 WL 2610613, at *24; *Vitale*, 1994 WL 654494, at *5; *see also U.S. Philips Corp. v. Princo Corp.*, No. 02 Civ. 246(CLB), 2005 U.S. Dist. LEXIS 6820 at *22 (S.D.N.Y. Jan. 24, 2005) ("[C]ontinued existence of the contractual arrangement is insufficient to toll the statute of

limitations"); *In re Cipro*, 261 F. Supp. 2d at 229 ("[T]he performance of an allegedly anti-competitive, pre-existing contract is not a new predicate act").[26]

Likewise, purchases pursuant to such contracts do not extend the limitations period even if they are made within the statute of limitations window. *In re Cipro*, 261 F. Supp. 2d at 229 (quoting *DXS v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996) ("the focus is on the timing of the causes of action, *i.e.*, the *defendant's overt acts*, as opposed to the effects of the overt acts" on the plaintiff) (emphasis added)); *see also Kabealo v. Huntington Nat'l Bank*, 17 F.3d 822, 828 (6th Cir. 1994) ("All courts that have written on the subject agree that it is the last overt act of the defendant, not any act of the plaintiff that triggers the statute of limitations."). "To hold otherwise would effectively abrogate the statute of limitations . . . because each sale of a product pursuant to the underlying agreement would start the statute of limitations running anew." *Southeast Missouri Hosp. v. C.R. Bard, Inc.*, No. 1:07CV0031 TCM, 2008 WL 4104534, at *3 (E.D. Mo. Aug. 27, 2008).[27]

Plaintiffs remaining allegations of a continuing violation also fail to support such a theory because they either allege the consequences of the purportedly anticompetitive acts, (AC

---

[26] Unlike the paradigmatic price-fixing case, in which each defendant's sale at a "fixed" price can be regarded as a new overt act, *see, e.g., Allen*, 748 F. Supp. 2d at 349, Plaintiffs allege that the insistence on the "Contractual Restraints" is what led to the Plaintiffs' singular injury. As a result, the effects claimed by Plaintiffs all are unabated inertial consequences of the conspiracy completed in 2007.

[27] *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F. 2d 263 (2d Cir. 1979), does not counsel a different result here. *Berkey Photo* was a Section 2 case involving ongoing exclusionary conduct by a monopolist where the plaintiffs identified at least two distinct overt acts *by the defendant* within the limitations period that the court deemed exclusionary and that were alone "sufficient to support the entire liability award." *Id.* at 293. Here, by contrast, Plaintiffs have not identified any new and independent overt acts by Defendants within the limitations periods. *See also* 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 320c1 at 331 (4th ed. 2014) (rejecting construction of *Berkey Photo* as allowing tolling of statute based on alleged continuing injury to a plaintiff on the grounds that "[i]f the mere charging of a monopoly price constitutes a 'continuing violation' tolling the statute, then we have indefinitely lengthened the statute of limitation on claims of successful monopolization.").

¶¶ 393(a), (e), (f)), or are wholly conclusory, (AC ¶¶ 393(b), (c), (d), (g)-(k)).

**B.    Plaintiffs Cannot Recover for Damages Suffered Outside the Limitations Period Even if That Period is Tolled**

Plaintiffs' "fraudulent concealment" and "continuing violation" arguments—even if they had merit (and they do not)—simply do not apply to claims for damages from airline tickets purchased *outside* of the applicable statute of limitations period. Such claims are undisputedly time-barred. *See Masters v. Wilhelmina Model Agency*, No. 02 Civ. 4911(HB), 2003 WL 145556, at *9 (S.D.N.Y. Jan. 16, 2003) (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189-90 (1997) (if the statute of limitations is not tolled, plaintiffs may recover for injuries incurred within the limitations period, but cannot "bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period")). At a minimum, Plaintiffs' claims for purchases before July 14, 2011 are time-barred, with the exception of (1) claims made under the laws of Vermont, Maine and Wisconsin, for which purchases made prior to July 14, 2009 are barred, and (2) claims under Missouri law, for which purchases made prior to July 14, 2010 are barred. *See* Appendix, Table 2.

**C.    The Doctrine of Laches Bars Plaintiffs' Federal Antitrust Claim**

The doctrine of laches bars untimely claims for equitable relief like Plaintiff's Sherman Act claim here. *Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07 CV 8455(LAP), 2008 WL 4547518, at *10-11 (S.D.N.Y. Oct. 10, 2008). As an initial matter, equitable claims accruing outside of the applicable statute of limitations period applicable to damages claims are presumptively barred by laches. *See Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996) ("[A]nalogous statutes of limitation remain an important determinant in the application of a laches defense" and create a presumption in favor of laches). The analogous statute of limitations for federal antitrust damages claim under the Clayton Act, 15 U.S.C. § 15, is four years

39

and therefore, at a minimum, any claims for injunctive relief that arose outside of that period should be barred.

But even when equitable claims are brought within an analogous statute of limitations period (assuming that had been the case here, which it is not), laches will bar such claims when equity warrants such a result. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1984-86 (2014) (requiring consideration of equitable factors including principles of third-party reliance and repose).[28] Where, as here, the conduct underlying Plaintiffs' claims is alleged to have occurred close to nine years before the original complaint was filed, and the facts upon which the claims are based were well-publicized, the presumption of laches cannot be rebutted. Moreover, the entry of an injunction now—nearly a decade after the contracts at issue were first entered into—could fundamentally alter the character of the GDS services upon which travel agents and others have long relied for comparison shopping for the benefit of their customers. *See Petrella*, 134 S. Ct. at 1978 (laches is warranted when relief would result in '*unjust* hardship' for 'innocent third parties') (quoting *Chirco v. Crosswinds Cmtys., Inc.*, 474 F.3d 227, 236 (6th Cir. 2007)).[29] Thus, Plaintiffs' federal claim for injunctive relief should be barred under the doctrine of laches.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Amended Complaint should be dismissed with prejudice in its entirety.

---

[28] *See Kloth v. Microsoft Corp.*, 444 F.3d 312, 325-26 (4th Cir. 2006) (Section 16 claims by indirect purchasers were barred by laches based on equitable principles even though the statute of limitations on parallel damages claims had yet to expire).

[29] As noted in a leading antitrust treatise, "[r]epose is especially valuable in antitrust, where tests of legality are often vague," "business practices can be simultaneously efficient . . . but also challengeable as antitrust violations," and innocent third parties often develop substantial reliance interests. Ensuring that antitrust challenges are timely asserted "minimiz[es] the social costs of any antitrust violation but giv[es] the parties repose for conduct that is lawful." 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 320a (4th ed. 2014).

40

Respectfully submitted,

January 15, 2016

/s/ George S. Cary

George S. Cary
Steven J. Kaiser
Carl Lawrence Malm
CLEARY GOTTLIEB STEEN
    & HAMILTON LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone:  (202) 974-1500
gcary@cgsh.com
skaiser@cgsh.com
lmalm@cgsh.com

Chris Lind
Adam L. Hoeflich
Andrew MacNally
Rebecca T. Horwitz
BARTLIT BECK HERMAN
    PALENCHAR & SCOTT LLP
Courthouse Place, 54 West Hubbard
Chicago, IL  60654
Telephone:  (312) 494-4400
chris.lind@bartlit-beck.com
adam.hoeflich@bartlit-beck.com
andrew.macnally@bartlit-beck.com
rebecca.horwitz@bartlit-beck.com

Karma M. Giulianelli
Sean C. Grimsley
BARTLIT BECK HERMAN
    PALENCHAR & SCOTT LLP
1899 Wynkoop Street, 8th Floor
Denver, CO 80202
Telephone:  (303) 592-3100
karma.giulianelli@bartlit-beck.com
sean.grimsley@bartlit-beck.com

*Counsel for Defendants Sabre Corporation,
Sabre Holdings Corporation, Sabre GLBL
Inc., and Sabre Travel International Limited*

January 15, 2016

*/s/ Richard S. Taffet* with permission
Richard S. Taffet
Stacey Anne Mahoney
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178-0060
Telephone: (212) 309-6000
richard.taffet@morganlewis.com
stacey.mahoney@morganlewis.com

R. Brendan Fee
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: (215) 963-5000
bfee@morganlewis.com

*Counsel for Defendants Travelport LP and*
*Travelport Worldwide Limited*

January 15, 2016

*/s/ Edward B. Schwartz* with permission
Edward B. Schwartz
David H. Coburn
Roy Goldberg
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue, NW
Washington DC 20036
Telephone: (202) 429-3000
eschwartz@steptoe.com

Evan Glassman
STEPTOE & JOHNSON, LLP
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 506-3900
eglassman@steptoe.com

David L. Meyer
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., NW
Washington, DC  20006
Telephone: (202) 887-1519
dmeyer@mofo.com

Michael B. Miller
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019-9601
Telephone: (212) 468-8009
mbmiller@mofo.com

*Attorneys for Defendants Amadeus IT*
*Group, S.A., Amadeus Americas, Inc. and*
*Amadeus North America, Inc.*

43

# APPENDIX

**TABLE 1**

**ANTITRUST STANDING AS TO PLAINTIFFS' STATE ANTITRUST CLAIMS**

| State | Harmonizes State Antitrust Statute With Federal Law | Applies *AGC* or Related Antitrust Standing Test |
|---|---|---|
| Arizona | Ariz. Rev. Stat. Ann. § 44-1412 ("[I]n construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes.") | *In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-02042, 2013 WL 1431756, at *10 (E.D. Mich. Apr. 9, 2013) ("[T]he Court concludes that the following jurisdictions apply the *AGC* test: Arizona.")<br><br>*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1095 (N.D. Cal. 2007) ("[A]pplication of the *AGC* multi-factor test is appropriate in determining plaintiffs' antitrust standing under the antitrust statute[] of Arizona . . . .")<br><br>*Consiglio-Tseffos v. Visa U.S.A, Inc.*, No. CV 2003-020170, 2004 WL 3030043, at *1 (Ariz. Super. Ct. Dec. 8, 2004) ("The injury suffered by Plaintiffs is not that of an indirect purchaser of the services sold by Defendants.") |

| State | Harmonizes State Antitrust Statute With Federal Law | Applies *AGC* or Related Antitrust Standing Test |
|---|---|---|
| California | *Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1814 n.1 (Cal. Ct. App. 1995) ("Because the Cartwright Act has objectives identical to the federal antitrust acts, the California courts look to cases construing the federal antitrust laws for guidance in interpreting the Cartwright Act.") | *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1085-89 (N.D. Cal. 2007) ("[T]he *AGC* test originally set forth by the Supreme Court in interpreting antitrust standing under the federal antitrust statutes, is the appropriate guide to follow.")<br><br>*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 9 CV 3690, 2015 WL 3988488, at *7-8 (N.D. Ill. June 29, 2015) (same)<br><br>*In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2014 WL 4743425, at *3 (S.D.N.Y. Sept. 15, 2014) ("[F]or the same reasons that plaintiffs failed to plausibly plead antitrust standing under an *AGC* analysis . . . they have failed to do so under the Cartwright Act, MARA, or the Donnelly Act.")<br><br>*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213, 1221 (C.D. Cal. 2003) ("As Sharman is neither a competitor nor customer in the restrained market, and because its injury is incidental, and not integral, to the alleged anticompetitive scheme, Sharman does not have standing.") |

| State | Harmonizes State Antitrust Statute With Federal Law | Applies *AGC* or Related Antitrust Standing Test |
|---|---|---|
| District of Columbia | D.C. Code § 28-4515 ("It is the intent of the Council of the District of Columbia that in construing this chapter, a court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes.") | *Peterson v. Visa U.S.A., Inc.*, No. Civ.A. 03-8080, 2005 WL 1403761, at *4-5 (D.C. Super. Ct. Apr. 22, 2005) ("In an effort to limit the scope of the federal provision's potentially broad sweep, the Supreme Court in *Associated General Contractors* described factors for a court to consider in deciding whether a plaintiff has standing . . . . Application of these factors convinces the Court that D.C. plaintiff lacks standing under § 28-4508.")<br><br>*Goldberg v. Visa U.S.A., Inc.*, No. 04 CA 0005158, 2007 WL 2011732 (D.C. Super. Ct. Mar. 2, 2007) (following *Peterson*) |
| Hawaii | Haw. Rev. Stat. § 480-3 (Hawaii's antitrust law "shall be construed in accordance with judicial interpretations of similar federal antitrust statutes, except that lawsuits by indirect purchasers may be brought as provided in this chapter.")<br><br>*Davis v. Four Seasons Hotel Ltd.*, 228 P.3d 303, 324 (Haw. 2010) ("Pursuant to this instruction [HRS § 480-3], this court has indicated that it is appropriate to look to the guidance of similar federal antitrust statutes as permitted in HRS § 480-3.") (internal citations omitted) | |

| State | Harmonizes State Antitrust Statute With Federal Law | Applies *AGC* or Related Antitrust Standing Test |
|---|---|---|
| Illinois | 740 Ill. Comp. Stat. Ann. § 10/11 ("When the wording of this Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act.") | *O'Regan v. Arbitration Forums, Inc.*, 121 F.3d 1060, 1066 (7th Cir. 1997) ("Federal antitrust standing rules apply under the Illinois Antitrust Act.")<br><br>*In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2013 WL 4505701, at *10 (N.D. Cal. Aug. 21, 2013) ("The question remains whether the [Direct Action Plaintiffs] meet *AGC*'s requirements.")<br><br>*County of Cook v. Philip Morris, Inc.*, 817 N.E.2d 1039, 1047 (Ill. App. Ct. 2004) ("We conclude the remoteness doctrine applies to the plaintiffs' second amended complaint. The remaining question is, have the plaintiffs set forth a direct relationship between the injury asserted and the injurious conduct in this case sufficient to withstand a motion for judgment on the pleadings?") |
| Iowa | Iowa Code § 553.2 ("This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter.")<br><br>*Max 100 L.C. v. Iowa Realty Co.*, 621 N.W.2d 178, 182 (Iowa 2001) ("[O]ur legislature intended the Iowa Competition Law to be construed uniformly with the Sherman Act.") | *Southard v. Visa U.S.A., Inc.*, 734 N.W.2d 192, 198-99 (Iowa 2007) ("[W]e apply the *AGC* factors to determine whether the plaintiffs may recover under Iowa law.") |

| State | Harmonizes State Antitrust Statute With Federal Law | Applies *AGC* or Related Antitrust Standing Test |
|---|---|---|
| Kansas | Kan. Stat. Ann. § 50-163 ("Except as otherwise provided in subsections (d) and (e), the Kansas restraint of trade act shall be construed in harmony with ruling judicial interpretations of federal antitrust law by the United States supreme court.")<br><br>*Smith v. Philip Morris Cos., Inc.*, 335 P.3d 644, 652 (Kan. App. 2014) ("provisions of the [Kansas Restraint of Trade Act] shall be 'construed in harmony' with the United States Supreme Court's interpretations of federal antitrust law") | *Orr v. Beamon,* 77 F. Supp. 2d 1208, 1211 (D. Kan. 1999) ("[S]tanding under the Kansas antitrust statutes requires an antitrust injury similar to that required under the Sherman and Clayton Acts."), *aff'd,* 4 F. App'x 647 (10th Cir. 2001)<br><br>*Moore v. Visa U.S.A., Inc.*, Nos. 03-cv-4085, 03 C 5002, 2004 WL 3030032, at *2 (Kan. Dist. Ct. Nov. 15, 2004) ("[I]t's too speculative and too far down the chain.") |
| Maine | *McKinnon v. Honeywell Int'l, Inc.*, 977 A.2d 420, 426 (Me. 2009) (Maine "looks to" federal antitrust law to construe its antitrust statute) | *Knowles v. Visa U.S.A., Inc.*, No. Civ. A. CV-03-707, 2004 WL 2475284, at *5 (Me. Super. Ct. Oct. 20, 2004) ("It is probable that the Maine Law Court, if presented with this issue, would look to the [*AGC*] factors in determining standing under Maine's antitrust laws . . . .") |

| State | Harmonizes State Antitrust Statute With Federal Law | Applies *AGC* or Related Antitrust Standing Test |
|---|---|---|
| Michigan | Mich. Comp. Laws § 445.784 ("It is the intent of the legislature that in construing all sections of this act, the courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes, including, without limitation, the doctrine of per se violations and the rule of reason.") | *In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-02042, 2013 WL 1431756, at *10 (E.D. Mich. Apr. 9, 2013) ("The Court concludes that the following jurisdictions apply the *AGC* test: . . . Michigan . . . .")<br><br>*In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2014 WL 4743425, at *3 (S.D.N.Y. Sept. 15, 2014) ("[F]or the same reasons that plaintiffs failed to plausibly plead antitrust standing under an *AGC* analysis . . . they have failed to do so under the Cartwright Act, MARA, or the Donnelly Act.")<br><br>*Stark v. Visa U.S.A., Inc.*, No. 03-055030-CZ, 2004 WL 1879003, at *4 (Mich. Cir. Ct. July 23, 2004) ("[I]t does not necessarily follow that Michigan's repeal of the *Illinois Brick* rule also eliminated the *Associated General Contractors* standing requirements.") |

| State | Harmonizes State Antitrust Statute With Federal Law | Applies *AGC* or Related Antitrust Standing Test |
|-------|------------------------------------------------------|--------------------------------------------------|
| Minnesota | *Howard v. Minn. Timberwolves Basketball Ltd. P'ship*, 636 N.W.2d 551, 556 (Minn. Ct. App. 2001) ("Minnesota antitrust law should be interpreted consistently with federal court interpretations of federal antitrust law unless Minnesota law clearly conflicts.") | *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 631 (Minn. 2007) (requiring "some prudential limits informed by foreseeability, proximate cause, remoteness, and relation of the injury to the purposes of the antitrust law")<br><br>*Gutzwiller v. Visa U.S.A., Inc.,* C4-04-58, 2004 WL 2114991, at *9 (Minn. Dist. Ct. Sept. 15, 2004) ("The Court agrees with Defendants assertion that Plaintiff's damages claims are inherently speculative."), *abrogated on other grounds* by *Lorix*, 736 N.W.2d 619, 632 (Minn. 2007) ("*Gutzwiller* . . . does provide an example of an injury that is most likely too remote and speculative to afford standing.") |
| Mississippi | *Walker v. U-Haul Co. of Miss.*, 734 F.2d 1068, 1070 n.5 (5th Cir. 1984) (federal and Mississippi antitrust laws are "analytically identical")<br><br>*Monsanto Co. v. Swann*, No. 4:00-CV-1481 CEJ, 2001 WL 34079480, at *3 (E.D. Mo. Sept. 19, 2001) ("[D]efendants have failed to state a claim based the federal antitrust laws. Consequently, their Mississippi state law antitrust claim must also be dismissed.") | *Owens Corning v. RJ Reynolds Tobacco Co.*, 868 So. 2d 331, 343 (Miss. 2004) ("Owens Corning's claims must fail based on remoteness of injury.")<br><br>*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1095 (N.D. Cal. 2007) ("[A]pplication of the *AGC* multi-factor test is appropriate in determining plaintiffs' antitrust standing under the antitrust statutes . . . Mississippi . . . .") |

| State | Harmonizes State Antitrust Statute With Federal Law | Applies *AGC* or Related Antitrust Standing Test |
|---|---|---|
| Nebraska | Neb. Rev. Stat. § 59-829 ("When any provision of sections 59-801 to 59-831 and sections 84-211 to 84-214 or any provision of Chapter 59 is the same as or similar to the language of a federal antitrust law, the courts of this state in construing such sections or chapter shall follow the construction given to the federal law by the federal courts.") | *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 296 (Neb. 2006) ("None of the factors from *Associated General Contractors* weigh in favor of concluding that appellants' claimed injury is the type intended to be protected by antitrust laws.  We conclude that appellants lack standing under *Associated General Contractors* to seek recovery for Visa and MasterCard's alleged violation of the Junkin Act.")<br><br>*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1095 (N.D. Cal. 2007) ("[A]pplication of the *AGC* multi-factor test is appropriate in determining plaintiffs' antitrust standing under the antitrust statutes of . . . Nebraska . . . .") |
| Nevada | Nev. Rev. Stat. § 598A.050 ("The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes.") | *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1095 (N.D. Cal. 2007) ("[A]pplication of the *AGC* multi-factor test is appropriate in determining plaintiffs' antitrust standing under the antitrust statutes of . . . Nevada . . . .") |
| New Hampshire | N.H. Rev. Stat. Ann. § 356:14 ("In any action or prosecution under this chapter, the courts may be guided by interpretations of the United States' antitrust laws.") | *In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-02042, 2013 WL 1431756, at *10 (E.D. Mich. Apr. 9, 2013) ("This Court shall also apply the *AGC* test to the claims asserted under the laws of the three relevant states with harmonization provisions (New Hampshire, New Mexico, and West Virginia).") |

| State | Harmonizes State Antitrust Statute With Federal Law | Applies *AGC* or Related Antitrust Standing Test |
|---|---|---|
| New Mexico | N.M. Stat. Ann. § 57-1-15 ("Unless otherwise provided in the Antitrust Act, the Antitrust Act shall be construed in harmony with judicial interpretations of the federal antitrust laws. This construction shall be made to achieve uniform application of the state and federal laws prohibiting restraints of trade and monopolistic practices.") | *Nass-Romero v. Visa U.S.A. Inc.*, 279 P.3d 772, 776-81 (N.M. Ct. App. 2012) ( "In this regard, the *AGC* Court set out five factors to consider in analyzing the issue of standing . . . . We now turn to each of the factors and evaluate them based on Plaintiff's allegations.")<br><br>*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1095 (N.D. Cal. 2007) ("[A]pplication of the *AGC* multi-factor test is appropriate in determining plaintiffs' antitrust standing under the antitrust statutes of . . . New Mexico.") |
| New York | *Anheuser-Busch, Inc. v. Abrams*, 520 N.E.2d 535, 539 (N.Y. 1988) ("[T]he Donnelly Act—often called a 'Little Sherman Act'—should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result.")<br><br>*S.O. Textiles Co. v. A & E Prods. Grp., a Div. of Carlisle Plastics, Inc.*, 18 F. Supp. 2d 232, 244 (E.D.N.Y. 1998) ("In light of the court's dismissal of plaintiff's federal antitrust claims, the Donnelly Act claims should also be dismissed.") | *Ho v. Visa U.S.A. Inc.*, 787 N.Y.S. 2d 677 (Table), 2004 WL 1118534, at *2-3 (N.Y. Sup. Ct. Apr. 21, 2004) (applying *AGC* factors to "conclude that plaintiffs' alleged injury is far too remote to provide antitrust standing under the Donnelly Act"), *aff'd*, 16 A.D.3d 256 (N.Y. App. Div. 2005)<br><br>*In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2014 WL 4743425, at *3 (S.D.N.Y. Sept. 15, 2014) ("[F]or the same reasons that plaintiffs failed to plausibly plead antitrust standing under an *AGC* analysis . . . they have failed to do so under the Cartwright Act, MARA, or the Donnelly Act.") |

| State | Harmonizes State Antitrust Statute With Federal Law | Applies *AGC* or Related Antitrust Standing Test |
|---|---|---|
| North Carolina | *Crouch v. Crompton Corp.*, Nos. 02 CVS 4375, 03 CVS 2514, 2004 WL 2414027, at *12 (N.C. Super. Ct. Oct. 28, 2004) ("[T]he General Assembly signaled a clear intent for the state courts to follow federal decisional guidance in interpreting and enforcing state antitrust laws.") | *Crouch v. Crompton Corp.*, Nos. 02 CVS 4375, 03 CVS 2514, 2004 WL 2414027, at *18 (N.C. Super. Ct. Oct. 28, 2004) ("The North Carolina courts would apply a multifactor test to determine standing in indirect purchaser cases. The requirements would recognize indirect purchaser standing, but engraft upon the statute the requirements of standing enunciated in *AGC*, modified to recognize the right to recover for injury created by statute for indirect purchasers.")<br><br>*In re: Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 9 CV 3690, 2015 WL 3988488, at *14-15 (N.D. Ill. June 29, 2015) (following *Crouch* and applying the *AGC* test in determining plaintiffs lacked antitrust standing under North Carolina law) |
| North Dakota | *Westgo Indus., Inc. v. W. J. King Co.*, No. A3-75-82, 1981 WL 2064, at *6 (D.N.D. Mar. 31, 1981) (North Dakota antitrust statute "offers no broader protection" than offered by federal antitrust statutes) | *Beckler v. Visa U.S.A., Inc.*, No. 09-04-C-00030, 2004 WL 2115144, at *3 (N.D. Dist. Ct. Aug. 23, 2004) ("As 'non-purchasers' of defendants' debit card services to merchants, the Court believes that plaintiffs lack standing to sue for the alleged restraint of trade in such services. Their alleged injury is simply too remote.") |

| State | Harmonizes State Antitrust Statute With Federal Law | Applies *AGC* or Related Antitrust Standing Test |
|---|---|---|
| Oregon | Or. Rev. Stat. § 646.715(2) ("The decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority in the construction of ORS 646.705 to 646.805 and 646.990.") | *Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 17 F. Supp. 2d 1175-78, 1176 n.2, (D. Or. 1998) ("[P]laintiffs fail to meet the proximate causation standard set forth in *Associated General Contrac*tors."), *aff'd*, 185 F.3d 957 (9th Cir. 1999) |
| Rhode Island | 6 R.I. Gen. Laws § 6-36-2 (Rhode Island antitrust laws "shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed")<br><br>*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island*, 239 F. Supp. 2d 180, 186-87 (D.R.I. Jan. 10, 2003) ("The provisions of the Rhode Island Antitrust Act . . . are construed in the same manner as the federal statutes.") | *Rhode Island Laborers' Health & Welfare Fund ex rel. Trustees v. Philip Morris, Inc*, 99 F. Supp. 2d 174, 184-87 (D.R.I. 2000) (dismissing federal and state antitrust claims using a "unified analysis," citing *AGC*)<br><br>*Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*, No. 98 CIV. 4067(LAP), 1999 WL 1201701, at *2, 8 (S.D.N.Y. Dec. 15, 1999) (similar) |
| South Dakota | S.D. Codified Laws § 37-1-22 ("It is the intent of the Legislature that in construing this chapter, the courts may use as a guide interpretations given by the federal or state courts to comparable antitrust statutes.")<br><br>*Byre v. City of Chamberlain*, 362 N.W.2d 69, 74 (S.D. 1985) ("[B]ecause of the legislative suggestion for interpretation found in SDCL 37–1–22, great weight should be given to the federal cases interpreting the federal | Tr. of Mot. Hr'g 54:4-55:1, *Cornelison v. Visa U.S.A., Inc.*, No. Civ. 03-1350 (S.D. Cir. Ct. Sept. 28, 2004) (applying *AGC* factors and holding that plaintiffs lacked antitrust standing) |

| State | Harmonizes State Antitrust Statute With Federal Law | Applies *AGC* or Related Antitrust Standing Test |
|---|---|---|
| | statute.") | |
| Tennessee | *Tenn. ex rel. Leech v. Levi Strauss & Co.*, No. 79-722-III, 1980 WL 4696, at *2 n.2 (Tenn. Ch. Sept. 25, 1980) ("The State anti-trust statute passed in 1891 is quite similar to the Sherman Anti-Trust Act passed by Congress in 1890. Authorities which define the character of private damage suits under the federal anti-trust statutes, particularly the Sherman Act, are most persuasive.") | |
| Utah | Utah Code Ann. § 76-10-3118 (Utah's antitrust laws "will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes")<br><br>*Am. Airlines v. Christensen*, 967 F.2d 410, 414 (10th Cir. 1992) ("[T]he Utah Antitrust Act, which is essentially identical to the Sherman Act, instructs that its construction is to be 'guided by interpretations given by the federal courts to comparable federal antitrust statutes . . . .'") | *In re Magnesium Oxide Antitrust Litig.*, No. 10-5943 (DRD), 2011 WL 5008090, at *7 n.9 (D.N.J. Oct. 20, 2011) ("[Indirect purchaser] Plaintiffs also lack standing to assert their state antitrust claims because those claims are construed in accordance with federal antitrust principles.") |
| Vermont | Vt. Stat Ann. tit. 9, § 2453a ("[T]he courts of this State shall be guided by the construction of federal antitrust law and the Sherman Act, as amended, as interpreted by the courts of the United States.") | *Fucile v. Visa U.S.A., Inc.*, No. S1560-03 CNC, 2004 WL 3030037, at *3 (Vt. Super. Ct. Dec. 27, 2004) ("Although the Vermont Consumer Fraud Act has broader remedial purposes than federal statutes, the court nevertheless believes that the Vermont Supreme Court would also draw upon the standing factors in *Associated General* |

| State | Harmonizes State Antitrust Statute With Federal Law | Applies *AGC* or Related Antitrust Standing Test |
|---|---|---|
| | | *Contractors* for guidance, at least to the extent that these factors are consistent with allowing 'indirect purchaser' standing.") |
| West Virginia | W. Va. Code § 47-18-16 ("This article shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes.") | *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *10 (E.D. Mich. Apr. 9, 2013) ("This Court shall also apply the *AGC* test to the claims asserted under the laws of the three relevant states with harmonization provisions (New Hampshire, New Mexico, and West Virginia).") |
| Wisconsin | *Wis. v. Waste Mgmt. of Wis., Inc.*, 261 N.W.2d 147, 153 & n.12 (Wis. 1978) ("We have stated many times that the construction of [the Wisconsin antitrust statute] is controlled by federal decisions under the Sherman Act.") | *Strang v. Visa U.S.A., Inc.*, No. 03-CV-011323, 2005 WL 1403769, at *3 (Wis. Cir. Ct. Feb. 8, 2005) ("[O]ur appellate courts would look to [the *AGC*] factors for guidance in assessing an indirect or remote purchaser's standing.") |

TABLE 2

## STATUTES OF LIMITATIONS ON
## PLAINTIFFS' STATE ANTITRUST CLAIMS

| State | Statutory Provision | Limitations Period |
|---|---|---|
| Arizona | Ariz. Rev. Stat. Ann. § 44-1410 | 4 years |
| California | Cal. Bus. & Prof. Code § 16750.1 | 4 years |
| District of Columbia | D.C. Code § 28-4511 | 4 years |
| Hawaii | Haw. Rev. Stat. § 480-24 | 4 years |
| Illinois | 740 Ill. Comp. Stat. 10/7(4) | 4 years |
| Iowa | Iowa Code § 553.16 | 4 years |
| Kansas | Kan. Stat. Ann. § 60-512(2) | 3 years |
| Maine | Me. Stat. tit. 14 § 752 | 6 years |
| Michigan | Mich. Comp. Laws § 445.781 | 4 years |
| Minnesota | Minn. Stat. § 325D.64 | 4 years |
| Mississippi | Miss. Code Ann. § 15-1-49 | 3 years |
| Nebraska | Neb. Rev. Stat. § 25-212 | 4 years |
| Nevada | Nev. Rev. Stat. 598A.220 | 4 years |
| New Hampshire | N.H. Rev. Stat. Ann. § 356:12 | 4 years |
| New Mexico | N.M. Stat. Ann. § 57-1-12 | 4 years |
| New York | N.Y. Gen. Bus. Law. § 340(5) | 4 years |
| North Carolina | N.C. Gen. Stat. § 75-16.2 | 4 years |
| North Dakota | N.D. Cent. Code, § 51-08.1-10 | 4 years |
| Oregon | Or. Rev. Stat. § 646.800 | 4 years |
| Rhode Island | 6 R.I. Gen. Laws § 6-36-23 | 4 years |
| South Dakota | S.D. Codified Laws § 37-1-14.4 | 4 years |
| Tennessee | Tenn. Code Ann. § 28-3-105(3) | 3 years |
| Utah | Utah Code Ann. § 76-10-3117 | 4 years |
| Vermont | Vt. Stat. Ann. tit. 12, § 511 | 6 years |
| West Virginia | W. Va. Code § 47-18-11 | 4 years |
| Wisconsin | Wis. Stat. § 133.18 | 6 years |

## STATUTES OF LIMITATIONS ON
## PLAINTIFFS' STATE CONSUMER PROTECTION CLAIMS

| State | Statutory Provision | Limitations Period |
|---|---|---|
| California | Cal. Bus & Prof. Code § 17208 | 4 years |
| Florida | Fla. Stat. § 95.11(3)(f) | 4 years |
| Illinois | 815 Ill. Comp. Stat. 505/10a(e) | 3 years |
| Massachusetts | Mass. Gen. Laws ch. 260, § 5A | 4 years |
| Missouri | Mo. Rev. Stat. § 516.120(1) | 5 years |
| South Carolina | S.C. Code Ann. § 39-5-150 | 3 years |