UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                                      :
DANIEL GORDON, *et al.*,                              :
                                                      :
                                  Plaintiffs,         :
                                                      :
                    v.                                :
                                                      :
AMADEUS IT GROUP, S.A., *et al.*,                     :
                                                      :
                                  Defendants.         :
                                                      :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 6, 2016____

15 Civ. 5457 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiffs filed the instant class action on behalf of consumers who have purchased airline tickets from nine major air carriers during the past ten years.  The Amended Complaint alleges that Defendants, a group of global distribution systems through which airlines provide fare and schedule information to travel agents, conspired to restrain competition in violation of various federal and state antitrust and state consumer protection laws. Defendants now move to dismiss on the grounds that Plaintiffs' state-law causes of action are preempted; Plaintiffs lack standing; and Plaintiffs' claims either fall outside the applicable statute of limitations periods or are equitably barred.  For the reasons stated in this Opinion, Defendants' motion is granted in part: Defendants' motion to dismiss Plaintiffs' claims for violations of state antitrust and consumer protections laws is granted, while their motion to dismiss Plaintiffs' claim under federal antitrust law is denied.

## BACKGROUND[1]

### A.    Factual Background

Defendants Amadeus IT Group, S.A., Amadeus North America, Inc., and Amadeus Americas, Inc. (together, "Amadeus"); Sabre Corporation, Sabre Holdings Corporation, Sabre GLBL Inc., and Sabre Travel International Limited (together, "Sabre"); and Travelport Worldwide Limited and Travelport LP (together, "Travelport," and together with Amadeus and Sabre, "Defendants"), are technology providers known as global distribution systems ("GDS").  GDSs serve as a conduit between travel service providers — such as airlines — and travel agencies, through which travel providers distribute information about available services and fares.  (Am. Compl. ¶ 1).  Each time a consumer books a flight segment from a travel agent using a GDS, the airline supplying the flight must pay a fee to the GDS.  (*Id.* at ¶ 3).  The major American airlines rely heavily on GDSs to disseminate information to travel agents; Defendants collectively control nearly the entire American market for GDS services, receiving approximately $2.4 billion in fees from airlines annually.  (*Id.* at ¶¶ 2-3).

---

[1]    The facts contained in this Opinion are drawn from Plaintiffs' Amended Complaint (Dkt. #106), cited as "Am. Compl."  For convenience, Defendants' brief in support of their motion to dismiss (Dkt. #153) is cited as "Def. Br."; Plaintiffs' brief in opposition (Dkt. #159) is cited as "Pl. Opp."; and Defendants' reply (Dkt. #163) is cited as "Def. Reply."

On December 3, 2015, the parties filed a joint letter motion for leave to file briefs in excess of the otherwise-applicable page limits.  (Dkt. #139).  The parties sought 50 pages for their respective principal briefs and 25 pages for Defendants' reply; the Court granted the parties 40 pages for the principal briefs and 20 pages for reply.  (Dkt. #140).  The Court was dismayed to see both sides circumvent these carefully-selected page limits by shunting large chunks of their briefs into footnotes with a smaller typeface.  For further submissions in this case, and for further cases before this Court, the parties are directed to follow both letter and spirit of the Court's orders.

1.      **The Development of the GDS Market and Federal Regulation**

In the 1960s, airlines began developing their own in-house computerized reservation systems ("CRS") for aggregating and supplying flight and fare information to consumers.  (Am. Compl. ¶¶ 139-40).[2]  Eventually, airlines allowed travel agents to access these systems directly, and additionally began sharing content with each other, such that travel agents could search flight information for multiple carriers from a single airline's CRS.  (*Id.* at ¶¶ 140-41).

In 1984, the Department of Transportation (the "DOT") began regulating the GDS market, requiring GDSs to charge the same fees to each airline and requiring airlines to offer the same content to all GDSs.  (Am. Compl. ¶ 143).  Consequently, airlines and GDSs could not negotiate over fees or content to gain a competitive advantage in the market.  (*Id.*).  Airlines were, however, able to withhold portions of their content from GDSs and offer withheld fares through alternative platforms, at whatever price point the airlines chose, so long as the content that *was* provided to a given GDS was the same as that provided to any other GDS.  (*Id.* at ¶ 146).  Shortly after the implementation of DOT regulations, airlines began divesting themselves of their GDS ownership, such that by the end of 2003 no GDS remained affiliated with an airline.  (*Id.* at ¶ 145).

During the early 2000s, web-based fare information providers and online travel agencies ("OTA") gained increased market presence and began to pose

---

[2]      These CRSs were early versions of GDSs.  (*See* Am. Compl. ¶ 294).  For the purposes of this motion, the Court treats the terms "CRS" and "GDS" as synonymous.

serious competition to GDSs.  (Am. Compl. ¶ 151).  During this same period, the DOT allowed its GDS regulations to expire, on the theory that deregulation would "enable each system and each airline to bargain over the terms on which [GDS] services should be provided," and that "vigorous enforcement of antitrust policy" — as opposed to direct regulation — was the preferred means of ensuring a healthy market.  (*Id.* at ¶¶ 154, 160).

### 2.    Competition in the Travel Information Distribution Market

During the time period immediately following deregulation, consumers had a number of choices for finding flight and airfare information.  In addition to employing traditional travel agencies, which used GDS services, consumers could acquire information from airlines' own websites, saving airlines significant cost when those consumers booked flights directly.  (Am. Compl. ¶ 170).  Further competition with the GDSs came from the so-called GDS New Entrants ("GNE"), which developed internet-based software to connect airlines with travel agents more efficiently and at a fraction of the price charged by GDSs.  (*Id.* at ¶¶ 171-73).  Other new competitors included OTAs; meta-search engines that aggregated links to airlines' websites; and new direct-connection platforms developed by traditional travel agencies.  (*Id.* at ¶¶ 181-83).  According to the Amended Complaint, "in the wake of deregulation, Defendants perceived the Airlines' content leverage and the new booking platforms and resulting market fragmentation as a clear and present danger" to Defendants' market dominance.  (*Id.* at ¶ 196).

### 3.    The Alleged Conspiracy Among Defendants

Plaintiffs allege that as the GDSs became more concerned about new market entrants, and particularly about airlines' "content and service concession[s] to favor low cost channels" such as GNEs, the GDSs began working together to stifle the growing competition.  (Am. Compl. ¶¶ 197-201).  Defendants realized that the success of platforms such as GNEs depended on airlines agreeing to offer them exclusive content or preferred status, and that the best strategy for the GDSs would be to prevent airlines from offering differentiated content to alternative platforms.  (*Id.* at ¶¶ 203-04).  Accordingly, beginning in 2006, the GDSs entered into a multi-part plan to strangle airlines' ability to negotiate fees and offer differentiated content.  (*Id.* at ¶¶ 19-25, 218, 228, 240).  The first step in Defendants' scheme consisted of the "Backstop Agreement": Sabre and Amadeus promised to supply each other with any content that airlines provided to only one of them.  (*Id.* at ¶ 220).  Plaintiffs contend that the "purpose of the Backstop Agreement was to make sure the GDSs stood as one against the Airlines."  (*Id.* at ¶ 224).

For the second step of Defendants' plan, Defendants "jointly demanded substantively identical terms on a take-it-or-leave-it basis during their 2006 contract[] negotiations" with the airlines.  (Am. Compl. ¶ 228).  Specifically, Defendants each required airlines to accept a "nearly identical" contract provision (the "Contractual Restraint") prohibiting the airlines from offering different content or lower prices through other distribution channels.  (*Id.* at ¶¶ 228, 242).  Plaintiffs allege that this "sudden lockstep" was an "abrupt and

5

radical departure from [Defendants'] previous approach to negotiations with the Airlines." (*Id.* at ¶ 234).  Plaintiffs allege that the Contractual Restraint prevented airlines from passing on to consumers the "savings realized from using less costly channels of distribution," as a "traveler who does not use a GDS must nevertheless pay ticket prices that include the GDS fees." (*Id.* at ¶ 241).  As airlines' contracts with GDSs came up for renewal in 2009, 2010, and 2011, Defendants allegedly continued to pursue their collusive strategy. (*Id.* at ¶¶ 251-88).  Both the Backstop Agreement and the Contractual Restraint were publicly announced by Defendants at the time of their inception.  (*Id.* at ¶¶ 236, 242).

Plaintiffs claim that, "[f]reed from external competition and agreeing amongst themselves that they would not compete for content, the Defendants charged inflated GDS fees.  These supracompetitive fees increase airline distribution costs, which in turn raises fares for all travelers." (Am. Compl. ¶ 322).  Defendants purportedly maintained their scheme in part through manipulation of travel agencies — particularly corporate travel agencies, which generate the majority of airline revenue derived from business travelers — by giving kickbacks to these agencies for every flight segment booked through a GDS.  (*Id.* at ¶ 334).  By providing financial incentives to travel agents for using GDSs, Defendants discouraged use of more efficient distribution platforms and purportedly ensured Defendants' continued market dominance.  (*Id.* at ¶¶ 334-38).

### 4.     The *US Airways* Action

On April 21, 2011, the airline US Airways filed suit against Sabre, alleging federal antitrust violations under the Sherman Act, and seeking damages and an injunction under the Clayton Act.   *See US Airways, Inc.* v. *Sabre Holdings Corp.*, 105 F. Supp. 3d 265 (S.D.N.Y. 2015) (granting in part and denying in part defendants' motion for summary judgment), *reconsideration denied,* No. 11 Civ. 2725 (LGS), 2015 WL 997699 (S.D.N.Y. Mar. 5, 2015).  On March 12, 2015, materials in that matter that had previously been sealed were made public for the first time.  (Am. Compl. ¶ 374). Plaintiffs allege that these newly available documents disclosed the specifics of Defendants' conspiracy, apprising Plaintiffs of their claims against Defendants and providing them with sufficient grounds upon which to bring suit.  (*Id.* at ¶¶ 374-76).

### B.     Procedural Background

Plaintiffs filed their initial Complaint in this matter on June 14, 2015. (Dkt. #1).  Plaintiffs then, upon Defendants' consent, filed an Amended Complaint on October 2, 2015, alleging claims for unlawful horizontal restraint of competition, in violation of the Sherman Act, numerous state antitrust laws, and numerous state consumer protection laws.  (Dkt. #92, 106).  Plaintiffs had previously filed an unopposed motion to appoint interim lead counsel on September 30, 2015 (Dkt. #99, 100), which motion the Court granted on December 7, 2015 (Dkt. #144).

Defendants filed their motion to dismiss Plaintiffs' Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) on January 1, 2016. (Dkt. #150, 153). Plaintiffs filed their brief in opposition on February 26, 2016 (Dkt. #159), and additionally filed a notice of supplemental authority on March 14, 2016 (Dkt. #162). Defendants concluded the briefing by filing their reply on March 28, 2016. (Dkt. #163).

## DISCUSSION

### A.   Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*,

550 U.S. at 557).  Moreover, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."  *Id.* at 663.

**B.     Plaintiffs' State-Law Claims Are Preempted**

> **1.     Applicable Law**

The Federal Aviation Act of 1958 (the "FAA"), Pub. L. 85-726, 72 Stat. 731, granted authority to the Civil Aeronautics Board (the "CAB") to regulate interstate air carriers' fares and potentially deceptive practices.  The FAA contained a saving clause, which permitted simultaneous state regulation of airlines' fares and trade practices.  49 U.S.C. § 1506.  This scheme shifted, however, with the passage of the Airline Deregulation Act of 1978 (the "ADA"), Pub. L. 95-504, 92 Stat 1705, the stated objective of which was to "encourage, develop, and attain an air transportation system which relies on competitive market forces to determine the quality, variety, and price of air services." Under the ADA, the CAB retained authority (transferred to the DOT in 1985) to enforce restrictions on deceptive trade practices as applied to air carriers. However, "[t]o ensure that the States would not undo federal deregulation with regulation of their own," *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992), the ADA explicitly preempted states from exercising regulatory authority over airlines, such that states "may not enact or enforce a law,

regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier."  49 U.S.C. § 41713(b)(1).[3]

The Supreme Court directly addressed the scope of ADA preemption in *Morales*, which involved states' efforts to regulate airlines' deceptive fare advertisements through the enforcement of state consumer protection statutes. The *Morales* Court focused on the ADA's language prohibiting state regulation "relating to" airline rates, routes, and services, defining that language as broadly embracing all "[s]tate enforcement actions having a *connection with or reference to* airline 'rates, routes, or services.'"  504 U.S. at 384 (emphasis added).  While not delineating the precise contours of ADA preemption, the Court clarified that a law need not be directed to the airline industry in order to fall within preemption's scope; the Court analogized ADA preemption to the similarly-worded preemption provision contained in the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. 93-406, 88 Stat. 829, under which the Court found that "state law may 'relate to' a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect."  *Id.* at 386 (quoting *Ingersoll-Rand* v. *McClendon*, 498 U.S. 133, 139 (1990)).

---

[3]   The FAA, as amended by the ADA, was originally codified at 49 U.S.C. §§ 1301-1542. The provision cited in the text was originally contained at 49 U.S.C. § 1305(a).  In 1994, Congress recodified the FAA and the ADA so that this provision is now found at 49 U.S.C. § 41713(b)(1).  As part of the recodification, Congress changed the phrase "rates, routes, or services" to "price, route, or service," but did not intend this modification to substantively change existing law.  *See* H.R. Conf. Rep. No. 677, 103rd Cong., 2d Sess. 83-84 (1994).

2.    **Analysis**

Defendants contend that Plaintiffs' state-law antitrust and consumer protection claims fall within the scope of ADA preemption, as they are necessarily "related to" airlines' ticket prices and services.  (Def. Br. 7-14; Def. Reply 1-6).  Plaintiffs respond that, because they are not directly bringing suit against airlines, their claims do not sufficiently "relate to" airline prices and services so as to be barred by the ADA.  (Pl. Opp. 2-15).  The Court finds that Defendants have the better argument.

The *Morales* Court found that states' guidelines establishing requirements "as to how [airline] tickets may be marketed" unavoidably "related to" airline rates, despite the fact that such guidelines did not directly regulate the fares or services themselves, but rather restricted the way in which such fares and services could be advertised.  *Morales*, 504 U.S. at 388.  The case at hand presents an analogous situation.  Here, Plaintiffs urge the application of state antitrust and consumer protection statutes, not to directly regulate airline fares themselves, but to invalidate the contractual arrangements airlines have entered into for the distribution — in part, the marketing — of their fares.  The Contractual Restraint at the center of Plaintiff's Amended Complaint requires that airlines offer their full services and lowest fares through GDSs.

The irony of applying ADA preemption to Plaintiffs' state-law claims is not lost on the Court: Airlines have, in a sense, contractually adopted the sort of restrictions that that the ADA prohibits states from imposing, and, Plaintiffs

contend, with the same anticompetitive result that the ADA seeks to avoid. Nevertheless, if the ADA prohibits states from requiring airlines to adhere to certain guidelines "relating to" their fares and services, logic dictates that it similarly precludes states from invalidating conditions that airlines have voluntarily assumed. The ADA frees airlines to make decisions relating to their pricing and services; that some decisions may seem to have an anticompetitive effect does not provide an exemption from that statute's prohibition on state regulation.

Plaintiffs argue at some length that the instant case is readily distinguishable from *Morales* and its progeny, noting in particular that Plaintiffs have brought claims not against airlines themselves, but rather against third-party GDSs. (Pl. Opp. 1). In light of the Supreme Court's broad interpretation of the ADA's "relating to" language, however, this distinction does not remove Plaintiffs' claims from the scope of ADA preemption. To predicate the ADA's preemptive effect on the identity of the defendant would permit states to make an end-run around Congress' intended deregulation of airlines. It cannot be that while the ADA prohibits, for example, state guidelines on airline fare advertising to be enforced against airlines, it permits enforcement of the very same guidelines — dictating what airfares can be presented, and the means and manner in which airline advertisements are displayed — against advertising agencies. This narrow reading of the statute's "related to" language is akin to the limiting interpretation rejected by the *Morales* Court when it held that, to give full expression to Congress' statutory

intent, ADA preemption may be applied even when the prohibited effect is "indirect." *Morales*, 504 U.S. at 386.  Accordingly, the Court joins those courts that have found that ADA preemption is not limited to claims brought directly against air carriers.  *See, e.g.*, *Lyn-Lea Travel Corp.* v. *Am. Airlines, Inc.*, 283 F.3d 282, 287 n.8 (5th Cir. 2002) ("ADA preemption is not limited to claims brought directly against air carriers"); *Am. Airlines, Inc.* v. *Travelport Ltd.*, No. 4:11-CV-244-Y, 2012 WL 12507645, at *3 (N.D. Tex. Feb. 28, 2012); *Manassas Travel, Inc.* v. *Worldspan, L.P.*, No. 2:07-CV-701-TC, 2008 WL 1925135, at *2 (D. Utah Apr. 30, 2008); *Frontier Airlines, Inc.* v. *United Airlines, Inc.*, 758 F. Supp. 1399, 1408 (D. Colo. 1989).

Legislative history provides additional support for finding that the ADA precludes claims brought specifically against GDSs.  The House Report on the Civil Aeronautics Board Sunset Act of 1984 (the "Report"), which Act eliminated the CAB and transferred certain areas of its authority to the DOT, specifically discusses federal regulations intended to address the potential for airlines to use GDSs to restrict competition.  *See* H.R. Rep. 98-793, 98th Cong., 2d Sess. 5 (1984).  It acknowledges "allegations that large airlines which sell [GDS services] to travel agents are using their monopoly powers in the [GDS] industry unlawfully to eliminate competition in the sale of air transportation," but states that this concern is best addressed through solely federal channels. *Id.*  Indeed, the Report opines that

> federal regulation insures a uniform system of regulation and preempts regulation by the states. If there was no federal regulation, the states might begin to regulate these areas, and the regulations could vary

13

> from state to state. This would be confusing and
> burdensome to airline passengers, as well as to the
> airlines.

*Id.* at 4.

Plaintiffs do not dispute this history, but contend that it is inapposite, as the GDSs under discussion in the Report were owned by the airlines. (Pl. Opp. 13-14). Thus, they were necessarily under the umbrella of "services" offered by air carriers, and regulating them would fall squarely within the ADA's prohibition on state regulation of an airline's "price[s], route[s], or service[s]." Now that airlines have divested themselves of GDS ownership, Plaintiffs argue, federal concerns about the potential for inconsistent regulations no longer apply. (*Id.*).

While facially appealing, the Court finds this reasoning unconvincing: As Plaintiffs themselves allege, the DOT continued expressly to regulate GDSs even after they had become independent from airlines. (Am. Compl. ¶¶ 145-52). It was not until January 31, 2004, that the DOT "allowed its GDS regulations to expire," at which time the DOT affirmatively "decided to deregulate the GDS industry because it determined that ending the regulatory scheme 'will enable each system and each airline to bargain over the terms on which [GDS] services should be provided.'" (*Id.* at ¶¶ 153-54). In other words, per Plaintiffs' own allegations, the DOT consciously chose to deregulate the GDSs with full awareness that those systems were no longer owned by the airlines, because the DOT believed — rightly or wrongly — that deregulation of airlines *and GDSs* would remove barriers to an efficient market. (*Id.* at ¶¶ 154-

56).  *See also* Computer Reservations System (CRS) Regulations, 69 Fed. Reg. 976-01 (2004).  That the DOT allegedly made this decision based on erroneous assumptions about market forces does not justify correctively legislating from the judicial bench.  Rather, the express decision to deregulate GDSs as independent entities lends further support to the view that ADA preemption reaches the instant claims, as the DOT clearly considered GDSs' function to be integral to the fares and services offered by air carriers.

Finally, contrary to Plaintiffs' assertion, the Second Circuit's findings of no preemption in *Abdu-Brisson* v. *Delta Airlines, Inc.*, 128 F.3d 77 (2d Cir. 1997), and *Goodspeed Airport LLC* v. *East Haddam Inland Wetlands & Watercourses Commission*, 634 F.3d 206 (2d Cir. 2011), do not counsel a similar finding in the instant case.  (*See* Pl. Opp. 8-9).  Plaintiffs point to the *Abdu-Brisson* Court's narrowing of the definition of airline "services" for the purposes of ADA preemption, and its expressed concern about interpreting the ADA in a manner that would give preemption an unnecessarily broad scope. (*Id.* (quoting *Abdu-Brisson*, 128 F.3d at 82)).  This concern is not, however, implicated by the very different facts of the present case.  In *Abdu-Brisson*, the claim for which the defendants asserted preemption was an age-discrimination claim brought by a group of Delta Air Lines pilots who claimed that they were integrated into Delta's pilot seniority list in a discriminatory manner.  *Abdu-Brisson*, 128 F.3d at 80.  That Court looked to "whether [the] state law actually 'interferes' with the purposes of the federal statute" — specifically, deregulation of airline prices and services — and found that it did not.  *Id.* at 82, 86.

Similarly, the Court in *Goodspeed Airport* found that state wetland regulations could be applied to private airport grounds; lack of ADA preemption was not a consequence of the defendant's status as a non-airline, but rather of the fact that any effect on airlines' prices or services was simply too attenuated to find that the regulation "related to" them.  *Goodspeed Airport*, 634 F.3d at 212.  Here, by contrast, the state claims asserted by Plaintiffs are directly related to airline pricing; indeed, a supracompetitive increase in ticket prices is the very crux of Plaintiffs' claim.  In other words, this Court applies precisely the same reasoning as the Second Circuit in its prior cases; but it applies that reasoning to different facts.  Accordingly, the Court reaches a different result, and finds that Plaintiffs' state antitrust and consumer protection claims are preempted.

## C.   Plaintiffs Have Adequately Pleaded Their Federal Antitrust Claim

### 1.   Plaintiffs Have Adequately Alleged Standing[4]

#### a.   Applicable Law

Section 16 of the Clayton Act provides in part that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws[.]"  15 U.S.C. § 26.  Both the Supreme Court and the Second Circuit have found this language to require that plaintiffs bringing an antitrust claim establish not only constitutional standing, but also antitrust standing.  *Cargill,*

---

[4]   Because the Court finds Plaintiffs' state-law claims to be preempted, it does not address whether Plaintiffs have satisfied the standing inquiry applicable to those claims.

*Inc.* v. *Monfort of Colo., Inc.*, 479 U.S. 104, 110-11 (1986); *see also Assoc. Gen. Contractors of Calif., Inc.* v. *Calif. St. Council of Carpenters*, 459 U.S. 519, 534 (1983) ("*AGC*") (discussing antitrust standing in regard to federal claims for damages); *Gelboim* v. *Bank of Am. Corp.*, — F.3d —, Lead Docket No. 13-3565-cv, 2016 WL 2956968, at *6 (2d Cir. May 23, 2016) (same).  In the context of damages claims brought under § 4 of the Clayton Act, the Supreme Court has defined such standing as consisting of (i) antitrust injury, meaning injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977), and (ii) satisfaction of the so-called "efficient enforcer" factors, *AGC*, 459 U.S. at 538-45; *Gelboim*, 2016 WL 2956968, at *13.

A plaintiff must establish antitrust injury regardless of whether he or she seeks relief under § 4 or § 16.  *Cargill*, 479 U.S. at 113; *Daniel* v. *Am. Bd. of Emergency Med.*, 428 F.3d 408, 437-38 (2d Cir. 2005).  When assessing whether a plaintiff seeking damages under § 4 satisfies the "efficient enforcer" component of antitrust standing, courts must consider (i) the "directness or indirectness of the asserted injury," viewed in light of the "chain of causation" linking a plaintiff's alleged injury and the defendant's anticompetitive conduct; (ii) the "existence of more direct victims of the alleged conspiracy"; (iii) whether damages are "highly speculative"; and (iv) whether allowing the claim would pose "either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other."  *AGC*, 459 U.S. at 538-45.

17

The Supreme Court has recognized, however, that "because [a claim for injunctive relief] under § 16 raises no threat of multiple lawsuits or duplicative recoveries, some of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16." *Cargill*, 479 U.S. at 111 n.6.  Nevertheless, even where a plaintiff's claim arises under § 16, "concepts such as foreseeability and proximate cause, directness of injury, certainty of damages, and privity of contract circumscribe a party's right to recovery." *Daniel*, 428 F.3d at 437 (internal quotation marks omitted).

### b.    Analysis

Plaintiffs' first claim for relief alleges unlawful horizontal restraint of competition, in violation of the Sherman Act.  (Am. Compl. ¶¶ 395-402). Defendants do not contest that Plaintiffs have adequately alleged antitrust injury.  They argue, however, that "better enforcers" exist, and that Plaintiffs' alleged injuries are too remote and speculative to confer antitrust standings. (Def. Br. 15-17, 20-28; Def. Reply 8-15).  None of these arguments succeeds in undermining Plaintiffs' standing to bring their federal injunctive claim.

### i.    Plaintiffs Are Appropriate Enforcers of Their Claim

The Court notes as a threshold matter that the existence of "better enforcers" becomes less significant when a plaintiff seeks only equitable relief, as duplicative recovery is not a concern, and an injunction brought by one party has precisely the same effect as an injunction brought by another.  *See Cargill*, 479 U.S. at 111 n.6; *see also In re Pub. Offering Antitrust Litig.*, No. 98 Civ. 7890 (LMM), 2004 WL 350696, at *5 (S.D.N.Y. Feb. 25, 2004) (describing

courts' primary concerns when determining whether a plaintiff is an appropriate enforcer of antitrust law as "avoiding duplicative liability and complex apportionment of damages"). Moreover, a plaintiff's "'[i]nferiority' to other potential plaintiffs can be relevant, but it is not dispositive"; rather, a court must consider whether the purportedly inferior plaintiffs are "also significantly motivated due to their 'natural economic self-interest' in paying the lowest price possible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009) (citing *Daniel*, 428 F.3d at 444).

In the present instance, Plaintiffs allege that the fees charged by GDSs are incorporated into airline ticket prices and passed along to consumers, and that as a consequence of the parity provision contained within the Contractual Restraint, consumers must effectively pay these fees regardless of whether they purchase from a provider who used a GDS's services. While this by no means ends the standing inquiry, it suffices to establish Plaintiffs as a class of persons who would be motivated to bring their instant claims. Consequently, the fact that there might perhaps be other motivated parties does not deprive Plaintiffs of standing to bring their federal injunctive claim.

### ii.     Plaintiffs Have Alleged Injuries That Are Sufficiently Direct and Non-Speculative

Contrary to Defendants' assertions, the fact that Plaintiffs are not themselves purchasers of GDSs' services does not, in and of itself, preclude them from having standing; the Supreme Court has made clear that its consideration of whether an injury is sufficiently "direct" is not so rigid. Rather, the Supreme Court has explained that its "use of the term 'direct'

should merely be understood as a reference to the proximate-cause enquiry," which is informed by certain policy concerns. *Holmes* v. *Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 272 n.20 (1992). Summarizing those concerns, the *Holmes* Court found that the "directness" of an injury consisted of three elements:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Id.* at 269-70 (citations omitted). As one court within this Circuit has stated, "[t]hese policy considerations determine recovery by the plaintiff, rather than epithets such as 'indirect' or 'derivative.'" *Info. Res., Inc.* v. *Dun & Bradstreet Corp.*, 260 F. Supp. 2d 659, 667 (S.D.N.Y. 2003).

Long before *Holmes*, the Supreme Court applied these same basic principles to find that indirect purchasers lacked standing to bring claims for damages under the Clayton Act. *Illinois Brick Co.* v. *Illinois*, 431 U.S. 720, 745-46 (1977). The Court in *Illinois Brick* premised its *per se* ban on indirect purchaser claims for damages on the concerns that permitting such claims would create difficulties in apportioning damages, and that it would potentially

frustrate § 4's intention to "compensate victims of antitrust violations for their injuries." *Id.* at 746-47.

Neither of the concerns animating the *Illinois Brick* decision is implicated by claims brought under § 16.  Unlike actions brought under § 4, antitrust claims seeking an injunction involve neither the need to quantify damages nor the need to avoid duplicative recovery — the first two of the three factors considered by the Court in *Holmes*.  This leaves the Court to consider whether the injuries purportedly suffered by Plaintiffs satisfy a baseline level of proximate cause, and whether allowing Plaintiffs to serve as private attorneys general would best "vindicate the public interest in antitrust enforcement." *Gelboim*, 2016 WL 2956968, at *15 (quoting *Gatt Commc'ns, Inc.* v. *PMC Assocs., L.L.C.*, 711 F.3d 68, 80 (2d Cir. 2013)).  On the particular facts of this case, Plaintiffs' claims satisfy this threshold.

Plaintiffs plead a direct path from Defendants' anticompetitive behavior to the harms allegedly suffered by Plaintiffs.  According to the Amended Complaint, Defendants conspired to force airlines to offer airfares at a uniform price inflated by GDS fees, thereby requiring consumers to pay supracompetitive rates.  (Am. Compl. ¶¶ 2, 361-63).[5]  Notably, while the alleged

---

[5]     The Court observes that Defendants' characterization of Plaintiffs' claims as too remote to confer standing is somewhat at odds with their preemption argument.  To be sure, the inquiry as to whether a claim is "related to" airline fares and services is distinct from the question of whether the alleged harms flow directly from Defendants' purported misconduct.  Nevertheless, Defendants highlight Plaintiffs' allegation that "[t]he supracompetitive prices paid by Plaintiffs and Class members for Airline tickets are traceable to, and the direct, proximate and foreseeable result of, Defendants' supracompetitive prices for GDS fees" — that is, they highlight the alleged direct link between Defendants' GDS fees and airline ticket prices — in support of their preemption argument.  (Def. Br. 7).  To then argue that the alleged "'singular' connection" between Defendants' conduct and increased prices for consumers fails to

violations caused harm to the airlines by restricting their bargaining power with GDSs, the Contractual Restraint preventing airlines from offering lower fares through alternate platforms would seem to most directly harm consumers: Airlines themselves pay nothing to any GDS when they offer an airfare directly from their own website, but *consumers* nevertheless allegedly pay more for that fare.  (*See id.* at ¶ 369 (quoting a 2014 DOT report finding that "[t]he contract provision effectively prohibits the carrier from offering a fare on its own website without the cost of the GDS fees built-in")).  As Defendants highlight, the majority of the Plaintiffs in the instant case are precisely those sort of direct-from-the-airline purchasers, who were forced to pay GDS fees on their tickets even though the airline did not pay GDS fees for those particular tickets.  (Def. Br. 23).

Recent cases addressing rate-manipulation schemes further support a finding that Plaintiffs have adequately pleaded proximate cause for their injunctive claim.  In *Merced Irrigation District* v. *Barclays Bank Inc.*, No. 15 Civ. 4878 (VM), 2016 WL 861327, at *1 (S.D.N.Y. Feb. 29, 2016), *reconsideration denied,* No. 15 Civ. 4878 (VM), 2016 WL 1317951 (S.D.N.Y. Apr. 1, 2016), the court found that the plaintiff had established standing to bring its antitrust claim where the defendant had allegedly manipulated daily index prices for electricity, and this "price manipulation had a demonstrable effect on the prices [the plaintiff] paid for electricity."  *Id.* at *6.  That the defendant was

---

present direct injury strikes the Court as too clever by half.  (*Id.* (quoting Am. Compl. ¶ 34)).

neither a producer nor a distributor of the good for which the plaintiff paid a supracompetitive rate did not vitiate the plaintiff's standing in the more exacting context of a suit for damages; certainly it would not pose an absolute bar to recovery where, as here, Plaintiffs seek injunctive relief. Similarly, the Second Circuit's reasoning in *Gelboim* v. *Bank of America Corp.*, — F.3d —, 2016 WL 2956968 (2d Cir. May 23, 2016) — while directed at antitrust injury, rather than directness or certainty of harm — indicates that, at the very least, the fact that a plaintiff is not a direct consumer of a defendant's goods or services does not bar him or her from having standing to pursue an antitrust claim, where he or she can show injuries that were proximately caused by a defendant's violations. Were it otherwise, the *Gelboim* Court would have had no cause to remand the case for consideration of the *AGC* factors.[6]

---

[6]    Defendants analogize Plaintiffs' claims to those brought by consumers against credit card companies for alleged anticompetitive agreements, pursuant to which merchants were required to accept debit cards if they accepted credit cards. (Def. Br. 27; Def. Reply 12-13). However, in finding that consumer-plaintiffs in those cases lacked standing, courts considered the "daunting evidentiary problems of proving any marginal effect of the excessive debit card fees vis a vis the multitude of other pricing factors that impact the ultimate purchase price of any and all products that a Visa or MasterCard merchant sells," observing that "one cannot 'conceive of an economically feasible way to administer a trial which would require inquiry into how every retailer set the price for every consumer good sold in this state.'" *Strang* v. *Visa U.S.A., Inc.*, No. 03 Civ. 011323, 2005 WL 1403769, at *4 (Wis. Cir. Ct. Feb. 8, 2005) (quoting *Crouch* v. *Crompton Corp.*, No. 02 CVS 4375, 2004 WL 2414027, at *27 (N.C. Super. Oct. 28, 2004)); *see also Gutzwiller* v. *Visa U.S.A., Inc.*, No. C4-04-58, 2004 WL 2114991, at *9 (Minn. Dist. Ct. Sept. 15, 2004), *abrogated on other grounds by Lorix* v. *Crompton Corp.*, 736 N.W.2d 619 (Minn. 2007).

To the extent that these cases are considered analogous to the case at hand, the concerns expressed therein are largely obviated by the fact that Plaintiffs' only remaining claim seeks injunctive relief rather than damages. Furthermore, the facts of the credit card cases suggest that the injuries there alleged were significantly less direct and certain than those alleged in the present case: Whereas plaintiffs in the credit card cases alleged an increase in prices charged by all card-accepting merchants for the entire range of goods offered by those merchants, here Plaintiffs claim an increase in price for a single service sold by a limited group of airlines. *See Peterson* v. *Visa U.S.A., Inc.*, No. Civ. A. 03-8080, 2005 WL 1403761, at *5 (D.C. Super. Ct. Apr. 22, 2005) (noting that consumers had failed "to point to any particular products" for which they

Finally, considering the speculativeness *vel non* of Plaintiffs' asserted injury, the facts as pleaded indicate that the alleged harms are sufficiently certain to confer standing.  The Second Circuit has recognized that, in considering the certainty of an antitrust injury, "the most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."  *In re DDAVP*, 585 F.3d at 689 (internal quotation marks omitted).  Moreover, while an unduly speculative injury may preclude standing even in the injunctive context, typically "[w]hether an injury is speculative in the antitrust standing context requires inquiry into the calculation of damages," *US Airways, Inc.*, 105 F. Supp. 3d at 288; but calculation of damages is not relevant here.  Rather, the question is whether Plaintiffs have pleaded sufficient certainty that they incur damages generally as a result of Defendants' anticompetitive conduct.  They have done so.

Defendants contend that, in reality, the many factors contributing to airline ticket prices render Plaintiffs' claims regarding the effect of GDS fees wholly conjectural.  (Def. Br. 26).  This, however, is a contested issue of fact that cannot be settled at the motion to dismiss stage.  Plaintiffs have alleged that airlines incorporate the supracompetitive prices charged by GDSs into every ticket they sell, thereby forcing consumers to pay supracompetitive rates

---

had paid inflated prices); *Knowles* v. *Visa U.S.A., Inc.*, No. Civ. A. CV-03-707, 2004 WL 2475284, at *6 (Me. Super. Oct. 20, 2004) (noting that "[w]hile this might be a manageable inquiry if only one product were involved, the complexity of inquiry is geometrically increased when all of the different pricing variables applicable to each and every retail product sold in the state must be considered").

regardless of how they purchase their ticket.  (Am. Compl. ¶¶ 361-69).

Plaintiffs support this contention with detailed information about the airline

industry, specifically noting that airlines have thin profit margins — from 1970

to 2010, the airline industry overall had a 0.1 percent profit margin — such

that the GDS fees charged per transaction are necessarily and inevitably

passed to consumers.  (*Id.* at ¶ 362).

In short, Plaintiffs have pleaded non-speculative injury.  Whether

discovery will bear that pleading out remains to be seen.

### 2.    The Doctrine of Laches Does Not Warrant Dismissal of Plaintiffs' Claim[7]

#### a.    Applicable Law

Laches is an equitable defense that bars a plaintiff's claim where "he is

guilty of unreasonable and inexcusable delay that has resulted in prejudice to

the defendant."  *Ivani Contracting Corp.* v. *City of N.Y.*, 103 F.3d 257, 259 (2d

Cir. 1997) (internal quotation marks omitted).  A defendant asserting laches

must show that "[i] the plaintiff knew of the defendant's misconduct; [ii] the

plaintiff inexcusably delayed in taking action; and [iii] the defendant was

prejudiced by the delay."  *Ikelionwu* v. *United States*, 150 F.3d 233, 237 (2d Cir.

1998).

---

[7]    In addition to arguing that Plaintiffs' federal Sherman Act claim is barred by the doctrine of laches, Defendants also contend that as a result of Plaintiffs' delay in bringing suit, Plaintiffs' state-law claims are barred by the applicable state statutes of limitations.  (Def. Br. 31-32).  Because the Court finds Plaintiffs' state-law claims to be preempted, the Court does not reach the issue of whether those claims fall within their respective limitations periods.

The Second Circuit has explained the relevance of analogous statutes of limitations when considering laches as a defense:

> When a suit is brought within the time fixed by the analogous statute, the burden is on the defendant to show ... circumstances exist which require the application of the doctrine of laches. On the other hand, when the suit is brought after the statutory time has elapsed, the burden is on the complainant to aver and prove the circumstances making it inequitable to apply laches to his case.

*Conopco, Inc.* v. *Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996) (quoting *Leonick* v. *Jones & Laughlin Steel Corp.*, 258 F.2d 48, 50 (2d Cir. 1958)).

"Laches is an affirmative defense and is generally not available on a motion to dismiss." *George Nelson Found.* v. *Modernica, Inc.*, 12 F. Supp. 3d 635, 655 (S.D.N.Y. 2014) (citing *Lennon* v. *Seaman,* 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999)); *see also Tri-Star Pictures, Inc.* v. *Leisure Time Prods., B.V.*, 17 F.3d 38, 44 (2d Cir. 1994) ("The equitable nature of laches necessarily requires that the resolution be based on the circumstances peculiar to each case.  The inquiry is a factual one." (internal citation omitted)); *Alston* v. *1749-1753 First Ave. Garage Corp.*, No. 12 Civ. 2676 (DRH) (GRB), 2013 WL 3340484, at *4 (E.D.N.Y. July 2, 2013) ("The defense of laches is an affirmative defense which properly should be raised in the defendant's answer and not upon a motion to dismiss." (internal quotation marks omitted)).  Nevertheless, "when the defense of laches is clear on the face of the complaint, and where it is clear that the plaintiff can prove no set of facts to avoid the insuperable bar, a court may consider the defense on a motion to dismiss." *Lennon*, 63 F. Supp. 2d at 439.

### b.   Analysis

Defendants argue that Plaintiffs' claim accrued outside the analogous four-year statute of limitations period applicable to damages claims, and that consequently a presumption of laches should arise; additionally, Defendants assert that an injunction "could fundamentally alter the character of the GDS services upon which travel agents and others have long relied for comparison shopping." (Def. Br. 39-40).  Plaintiffs contend in response that their claims are timely, both under a fraudulent concealment and a continuing conspiracy theory, and that in any event Defendants have failed to demonstrate any prejudice justifying the application of laches.  (Pl. Opp. 39-40).

Putting to one side the question of whether Plaintiffs' claims accrued within the analogous statute of limitations period, Plaintiffs have sufficiently alleged equitable reasons why the doctrine of laches should not be applied to bar their claims at the motion to dismiss stage.  Plaintiffs allege that prior to the unsealing of the *US Airways* action in March 2015, Plaintiffs did not know, and could not have known, about their causes of action against Defendants due to Defendants' fraudulent concealment.  (Am. Compl. ¶¶ 374-90).  *See Hermes Int.* v. *Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000) ("This good-faith component of the laches doctrine is part of the fundamental principle that 'he who comes into equity must come with clean hands.'" (citing *Precision Instrument Mfg. Co.* v. *Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945))).  Plaintiffs support this assertion with specific examples of alleged misconduct by Defendants: They claim that Defendants falsely held the

27

Backstop Agreement up in public as being adopted expressly for "the benefit of the consumer," while also agreeing internally to conceal any details of the agreement from the public and implicitly acknowledging that competition between GDS would be better for consumers (Am. Compl. ¶¶ 377-80, 389); misrepresented the effect that eliminating the Contractual Restraint would have on airline ticket prices (*id.* at ¶¶ 383-84); and misled the DOT in their explanation of the relationship between airlines and GDSs (*id.* at ¶¶ 385-86).[8] In addition to presenting specific instances of misleading representations, Plaintiffs allege that Defendants made a concerted effort to keep the details of their scheme confidential, such that Plaintiffs' diligence could not have discovered the full facts underlying their claims.  (*Id.* at ¶¶ 374, 376-78).  Thus, taking all of Plaintiffs' allegations as true, Plaintiffs' Amended Complaint justifies declining to bar Plaintiffs' claim under the doctrine of laches at this stage of the proceedings.

Furthermore, Defendants have pointed to nothing in the pleadings that would support an inference of prejudice to Defendants as a consequence of Plaintiffs' delay in bringing suit.  Defendants state only that an injunction "could fundamentally alter the character of the GDS services upon which travel

---

[8]    The Court notes that unlike the application of fraudulent concealment to toll a statute of limitations, specific elements need not be pleaded when asserting a defendant's wrongdoing to counter the affirmative defense of laches.  *State of N.Y.* v. *Cedar Park Concrete Corp.*, 684 F. Supp. 1229, 1234 (S.D.N.Y. 1988) ("Although the fraudulent concealment doctrine requires the pleading of specific elements, there is no similar requirement to counter the laches defense against equitable relief."); *see also Tuffy* v. *Nichols*, 120 F.2d 906, 909 (2d Cir. 1941) (finding that "[e]ven if there was no intentional or fraudulent concealment, [defendants] can hardly plead the equitable defense of laches" where they knew of plaintiff's ignorance).

agents and others have long relied for comparison shopping for the benefit of their customers." (Def. Br. 40). Thus the purported hardship Defendants have identified would not befall Defendants themselves, but would rather affect "travel agents and others." The Court acknowledges that there may be cases in which prejudice to an innocent third party warrants the application of laches, *cf. Petrella* v. *Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1978 (2014) (reversing lower courts that applied laches to bar copyright infringement action, noting that allowing the suit to proceed would "work no unjust hardship on innocent third parties"); this is not such a case. Defendants provide only the vague statement that an injunction could "fundamentally alter the character of [] GDS services" — perhaps so, but there is no reason for the Court to assume that such alteration would be to the *detriment* of "travel agents and others." In short, the axiomatic observation that an injunction will change the status quo is not an identification of prejudice sufficient to equitably bar Plaintiffs' claims.

Both because Plaintiffs have sufficiently pleaded equitable reasons why laches should not bar their claims at this juncture, and because Defendants have not pointed to any prejudice suggesting application of laches is warranted, the Court denies Defendants' motion to dismiss Plaintiffs' federal claim on that ground.

## CONCLUSION

For the reasons stated in this Opinion, Defendants' motion to dismiss Plaintiffs' claims for violations of state antitrust and consumer protections laws is GRANTED.  Defendants' motion to dismiss Plaintiffs' claim under federal antitrust law is DENIED.  A conference to discuss next steps in this matter will take place on **July 26, 2016**, **at 11:00 a.m.**, in Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York 10007. The Clerk of Court is directed to terminate docket entries 126, 131, and 150.

SO ORDERED.

Dated:       July 6, 2016
             New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge